UNITED STATES of America, Appellant,

v.

Victor J. ORENA and Pasquale Amato,
Defendants–Appellees.

No. 739, Docket 92–1595.

United States Court of Appeals,
Second Circuit.

Argued Oct. 28, 1992.

Decided Jan. 19, 1993.

John Gleeson, Asst. U.S. Atty., Brooklyn, NY (Andrew J. Maloney, U.S. Atty., E.D.N.Y., George A. Stamboulidis, Andrew Weissmann, Asst. U.S. Attys., Brooklyn, NY, of counsel), for appellant.

Gustave H. Newman, New York City, for defendant-appellee Victor J. Orena.

Benjamin Brafman, New York City, for defendant-appellee Pasquale Amato.

Before: MESKILL, Chief Judge, WINTER, Circuit Judge, and RESTANI, Judge.*

WINTER, Circuit Judge:

The government appeals from Judge Weinstein's orders releasing Victor J. Orena and Pasquale Amato from pretrial detention. They face RICO charges based on predicate acts of murder, conspiracy to murder, loansharking, and illegal possession of weapons. Their releases were stayed pending this appeal. Orena's trial began on November 19, 1992, and he was convicted on December 21. Accordingly, as to Orena, this appeal is moot. Amato's trial, however, is under way. The government argues that delays in the trial dates do not warrant the release of Amato and that the conditions of bail do not ensure the

---

* The Honorable Jane A. Restani, Judge, U.S. Court of International Trade, sitting by designa-    tion.

safety of the community. We agree and reverse.

### BACKGROUND

Orena and Amato were originally indicted in their alleged capacities as Acting Boss and captain, respectively, in the Colombo Family of La Cosa Nostra, an "enterprise" under RICO. The predicate acts were conspiring to murder, and murdering, Thomas Ocera. Amato was further charged with being a convicted felon in possession of a firearm.

The indictment alleged that Orena was named Acting Boss of the Colombo Crime Family after the 1986 imprisonment of its then Boss, Carmine Persico. Persico came to hope that his son, Alphonse, would assume control of the Family upon Alphonse's scheduled release from prison in 1993. Orena, however, desired to become the official Boss, and a violent war erupted between the Persico and Orena factions. An estimated twenty shootings took place between November 1991 and April 1992 that resulted in the death of eight persons, some of them innocent bystanders. Orena and Amato were arrested in April 1992. At the time of their arrests, arms were found in their respective residences. The war appears to have subsided thereafter, although the government states in its brief that a war related killing occurred on October 7, 1992.

At a detention hearing on April 6, 1992, evidence was introduced to demonstrate that Orena and Amato played supervisory roles in the Colombo Family criminal enterprise and in its use of violence. Evidence showed that Orena was a leader in the fratricidal war and that plans for further killings existed. Judge Glasser found that Orena and Amato were dangers to the community and that Amato was a flight risk. Judge Glasser rejected Orena's argument that house-arrest, electronic surveillance, and a bail package that included the property of family members as security would insure the community's safety. He denied bail and ordered appellees detained pending trial.

A superseding indictment added a defendant from the Persico faction, Michael Sessa, and broadened the charges against Orena and Amato. The racketeering acts alleged against Amato included the Ocera murder, conspiring to engage in loansharking and, as to Orena, conspiring to murder members of the Persico faction of the Colombo Family as part of the fratricidal war. Orena was charged with using and carrying firearms during and in relation to a violent crime. The indictment also alleged that Orena appointed Amato Acting Underboss of the Family for about six months in 1990. Trial was set for September 14, 1992.

In August, due to Judge Glasser's crowded docket, the case was transferred to Judge Weinstein for a trial to begin on October 5, 1992. Although Judge Weinstein was willing to accelerate the trial date to September 14, all counsel opposed the earlier date. The government, due to the illness of the lead prosecutor, requested that the trial date be moved to October 19.

On September 14, Judge Weinstein ordered that the Orena faction defendants, Orena and Amato, be tried separately from the Persico faction defendant, Michael Sessa, added in the superseding indictment. The government requested that Sessa's trial be scheduled first. Sessa's trial was set for October 5. The district court subsequently granted Sessa's request for an adjournment to October 26. The trial date for Orena and Amato was then set for November 16.

At an October 9, 1992 status conference, counsel for Orena and Amato complained that the government had delayed the beginning of their trial. However, Judge Weinstein found that "[a] realistic reading of the total record will show the defendants have, up to this point, not been anxious to push the case any more than the government."

Counsel also made oral applications for bail at the status conference. Judge Weinstein ruled that the November 16 trial date was a "new circumstance" warranting release. When the government argued that the appellees were dangers to the commu-

nity and attempted to detail the number of deaths caused by the fratricidal war, Judge Weinstein responded by stating that "[i]f the war heats up you can come in again." When the government replied that "[i]t may be too late for the victims if the war heats up," Judge Weinstein responded, "The likelihood is that the victims will be part of the gang. It is true that these gangs have become much less efficient. Some of them can hardly shoot straight, but I don't believe that there's a substantial risk to the population." Judge Weinstein then admitted Orena and Amato to bail, finding that they were not flight risks and that, given certain restrictive conditions of bail, they were not dangers to the community. The terms of bail were as follows: bail ($3 million for Orena, $1 million for Amato) was secured by family members' residences and property; Orena and Amato were confined to their homes except for visits to their attorneys; visitors were restricted to immediate family; phone calls were restricted to attorneys; the government was allowed to install a device to monitor calls; Orena and Amato were compelled to wear an electronic bracelet and to call pretrial services once a day; and, finally, they consented to having their homes searched by the government at any time.

Subsequent to granting bail, Judge Weinstein severed Amato's case and set a trial date for the conclusion of Orena's trial. Judge Weinstein indicated he might transfer Amato's case to another judge should further delay be foreseen. There has been, however, no unforseen delay. Orena's trial began on November 19, 1992, and he was convicted on all counts on December 21, 1992. Amato's trial began on January 11, 1993.

## DISCUSSION

■ We do not agree that the postponement of trial dates constitutes a new circumstance justifying release under the Bail Reform Act. Even if defense counsel had sought an early trial date, which they explicitly did not, there is no statutory basis for the conclusion that the length of a pretrial detention warrants the granting of bail where there has been a finding of danger to the community. To the contrary, Congress rejected any specific time limit under the Bail Reform Act for detention pending trial, relying instead upon the Speedy Trial Act. *United States v. Colombo*, 777 F.2d 96, 100–01 (2d Cir.1985).

■ The length of a defendant's pretrial detention may, of course, be challenged under the Due Process Clause. However, "the due process limit on the duration of preventive detention 'requires assessment on a case-by-case basis, since due process does not necessarily set a bright line limit for length of pretrial confinement.'" *United States v. Gonzales Claudio*, 806 F.2d 334, 340 (2d Cir.) (quoting *United States v. Salerno*, 794 F.2d 64, 78–79 (2d Cir.1986) (Feinberg, C.J., dissenting), *rev'd*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)), *cert. dismissed sub nom. Melendez–Carrion v. United States*, 479 U.S. 978, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986). To determine whether the length of a pretrial detention violates a defendant's due process rights, we must weigh: (i) the length of detention; (ii) the extent of the prosecution's responsibility for the delay of the trial; and (iii) the strength of the evidence upon which the detention was based, in this case, evidence of Amato's danger to the community. *Id.; see also United States v. Ojeda Rios*, 846 F.2d 167, 169 (2d Cir.1988) (applying the test to risk of flight); *United States v. Gotti*, 776 F.Supp. 666, 671 (E.D.N.Y.1991) (applying the test to dangerousness).

■ Applying these standards, we first find that the length of detention has not exceeded allowable limits. Accordingly, counting the time of relevant pretrial detention as beginning on April 1 (although Orena and Amato waived their speedy trial rights until at least April 17), the date of their arrest, until the beginning of trial, January 11, the total period for Amato is approximately nine months. We have expressly held that a slightly lesser period, in and of itself, does not violate due process. *See, e.g., United States v. Berrios–Berrios*, 791 F.2d 246, 251–52 (2d Cir.) (eight months detention for risk of flight not violative of

Due Process Clause), *cert. dismissed,* 479 U.S. 978, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986).[1]

We also note that given the multi-factor test of *Gonzales Claudio,* the length of a detention period will rarely by itself offend due process. Moreover, the constitutional limits on a detention period based on dangerousness to the community may be looser than the limits on a detention period based solely on risk of flight. In the former case, release risks injury to others, while in the latter case, release risks only the loss of a conviction. We find that the length of detention in the instant case does not in and of itself offend due process, and indeed does not argue in favor of release when considered with the other *Gonzales Claudio* factors.

Turning to the second factor, we agree with Judge Weinstein that the government is not primarily responsible for the delay in the instant matter. As noted, defense counsel initially declined to seek an early trial date, or any date at all. Moreover, defense counsel declined to accelerate the trial date from October 5 to September 14 at the suggestion of Judge Weinstein.

Counsel for Amato argues that the government is responsible for delay because it indicted Sessa, Orena, and Amato jointly, and the subsequent consideration and granting of severance motions (in Amato's case, with the consent of the government), caused Amato's trial date to be postponed. However, rules concerning severance are highly discretionary, *United States v. Rea,* 958 F.2d 1206, 1225 (2d Cir.1992), and Amato has not given us reason to conclude that the severances here were necessary as a matter of law rather than permissible discretionary acts. There is thus no reason to infer that the joint indictment was intended to cause delay, and we decline to adopt a rule that would deter the government from seeking joint trials (or consenting to severance) as a means of economizing judicial and other resources. Moreover, delay would have been lessened in the case of separate indictments only because of the assignment of each case to a different judge. An assignment to a different judge is also possible after severance, a course of action that was available to Judge Weinstein with regard to Amato.

Finally, the last factor weighs extremely heavily in the government's favor. There is ample evidence that Amato constitutes a danger to "the safety of ... other person[s] and the community." 18 U.S.C. § 3142(e) (1988). Indeed, Judge Weinstein did not conclude that appellees were not dangerous, but rather held that the bail restrictions adequately protected the safety of the community.

In addition to the indictment, *see United States v. Contreras,* 776 F.2d 51, 54 (2d Cir.1985), the government submitted evidence from five confidential sources and two witnesses who had already testified publicly in another trial. This evidence demonstrated that Orena is Acting Boss of the Colombo Family and that his efforts to become permanent head of the Family are responsible for the bloody, fratricidal war. Amato is Orena's "right-hand man" and has served, at Orena's direction, as Acting Underboss of the Family. He has most recently served as a captain and directed a crew that engaged in specific crimes, alleged to include murder and loansharking. Finally, Amato possessed a dangerous weapon when arrested, demonstrating his capacity for violence.

The fratricidal war, including over twenty shootings and the injury and deaths of innocent bystanders, proves the deadly "nature and seriousness of the danger to any person or the community that would be posed by [Amato's] release." 18 U.S.C.

---

1. In *United States v. Melendez–Carrion,* 790 F.2d 984 (2d Cir.1986), a majority of the panel agreed that pretrial detention in excess of eight months on the grounds of dangerousness violated due process. However, at least one member of the majority based his position solely on the ground that pretrial detention on the basis of dangerousness to the community was unconstitutional. This position was squarely rejected by the Supreme Court in *United States v. Salerno,* 481 U.S. 739, 744–45, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). Therefore, only one judge in *Melendez–Carrion* held that eight months of pretrial detention on the ground of dangerousness violates due process.

§ 3142(g)(4). We cannot agree that waiting to see "[i]f the war heats up again" or that relying upon perceived gangland inefficiency protects the community.[2] The war is a demonstrated danger to bystanders, even if we make the heroic assumption that the Bail Reform Act does not require detention to protect members of gangs.

Amato argues strenuously that the record does not show that his participation in the fratricidal war or his danger to the community is comparable to Orena's. Nevertheless, the record does show that Amato is an important member of the Orena faction and one who readily furthers its criminal objectives through violence. Moreover, while Amato may argue that he is harmless in comparison to Orena, that argument merely underlines Orena's criminal and violent propensities but is hardly persuasive of Amato's pacific nature.

We therefore conclude that the detention period contemplated does not, in light of the causes of delay and the dangerousness of Amato, violate due process.

█ The only remaining question, therefore, is whether the conditions of bail mitigate the threat that Amato represents to the community. Section 3142(g) sets forth the factors determining whether "there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(g). These factors include the nature and circumstances of the offense charged, the weight of the evidence against the person, the history and characteristics of the person, and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). Where the court concludes by clear and convincing evidence that "no condition or combination of conditions will reasonably assure ... the safety of any other person and the community," detention shall be ordered. 18 U.S.C. § 3142(e); see also 18 U.S.C. § 3142(f).

We do not agree that the bail conditions set by the district court eliminate the danger to the community or are superior to detention for purposes of the Bail Reform Act. See United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir.1991). As noted, the first two statutory factors, the nature and circumstances of the offense charged and the weight of the evidence, weigh heavily against pretrial release. We agree with Judge Glasser's conclusions in Gotti, which involved substantially the same conditions as are at issue here, that the electronic surveillance systems can be circumvented by the "wonders of science and of sophisticated electronic technology," and that the monitoring equipment can be rendered inoperative. Gotti, 776 F.Supp. at 672–73.

We rejected reliance upon similar bail conditions in United States v. Colombo, 777 F.2d 96 (2d Cir.1985). Colombo involved, like Amato here, a crime figure who directed a "crew" to perform crimes. Id. at 97. Although concededly the conditions on Colombo's release were not as complete as those in the instant matter, they nonetheless sought to achieve the same goal by limiting contact with codefendants, forbidding the commission of any crime, confining the defendant to the county, and requiring that he check in with pretrial services. Id. at 99–100. We found that those conditions offered "little, if any, assurance that the danger Colombo was found to present to the public is controlled or diminished." Id. at 99. The additional conditions in this case, including house arrest, electronic surveillance, and interactions limited to immediate family, do not alleviate appellee's danger to the community.

Further, the contention that the specified conditions of bail protect the public more than detention is flawed. These conditions would at best "elaborately replicate a detention facility without the confidence of security such a facility instills." Gotti, 776 F.Supp. at 672. Safety of the community will be assured only if the government provides trustworthy, trained staff to carry

---

**2.** Although we need not rely upon it, the last killing in the fratricidal war is said by the government to have been just two days before the hearing leading to the release.

out the extensive monitoring of homes, telephones, and travel that would be necessary to ensure compliance with the conditions of bail. If staff were not provided, protection of the community would be left largely to the word of Amato that he will obey the conditions. We find nothing in the Bail Reform Act that requires the government to staff home detention centers or allow dangerous defendants to be at large based upon their promise not to violate conditions of bail.

Moreover, Amato is sufficiently dangerous that we can safely say that if he is entitled to the stipulated conditions of bail, every defendant of means would be entitled to release on similar conditions. Given the fact that numerous defendants might at any time be at large under these conditions, monitoring might well require extensive staffing. Quite apart from considerations of cost—although these are important—we do not believe that adequate staffing of home detention centers can be accomplished without extensive training both of the monitoring staff and their supervisors, activities not contemplated by the Bail Reform Act. Finally, whether, even with trained staff, home detention centers would adequately protect the community is problematic. *Id.* at 672.

We therefore reverse.