UNITED STATES of America,

v.

Eric MILLAN, et al., Defendants.

No. S9 91 Cr. 685 (SWK).

United States District Court,
S.D. New York.

June 23, 1993.

Mary Jo White, Acting U.S. Atty., S.D.N.Y. by Dietrich L. Snell, Roland G. Riopelle, Asst. U.S. Attys., for U.S.

Michael B. Pollack, New York City, for defendant Eric Millan.

## ORDER

KRAM, District Judge.

Defendant Eric Millan ("Millan") was arrested on August 1, 1991, and thereafter charged with participating in a heroin distribution conspiracy, known as "Blue Thunder." At all times subsequent to his arrest, Millan has been detained. On May 20, 1993, Millan moved for his conditional release pending retrial[1] on the ground that his pretrial detention for a total of more than twenty-three months violates due process. On May 28, 1993, following a two day hearing, Magistrate Judge Theodore H. Katz orally granted Millan's application and ordered his conditional release on the basis of the length of pretrial detention.[2] *See* Transcript of Hearing before the Honorable Theodore H. Katz, dated May 28, 1993 ("Hearing Tr."), at 35–51.

The Government now appeals the Magistrate Judge's ruling on the grounds that Millan's continued detention is necessary as he constitutes both a risk of flight and a danger to the community. In support of its position, the Government relies on the testimony of two witnesses, Klepper Duche, a/k/a "Pedro Gonzales" ("Duche") and Heriberto Rosario ("Rosario"), both of whom participated in Millan's alleged heroin distribution business. Specifically, at a hearing on June 3 and 7, 1993, conducted by the Court pursuant to 18 U.S.C. § 3142(f)(1)(B), both Duche and Rosario described Millan's advancement in the heroin distribution business, the acts of violence committed by others to protect that business, and Millan's extensive cocaine use. In addition, the Government relies upon a videotape introduced at the hearing in which Millan is apparently engaged in the operation of a money counting machine. Further, the Government introduced Millan's passport, which evidences numerous trips to Brazil, Argentina, Mexico and Chile; an affidavit by Pretrial Services Officer Evans Ka-

vallines regarding the shortcomings of the electronic monitoring system as a means of preventing flight; and various glassine envelopes stamped with the Blue Thunder logo.

Although the Court finds that the evidence presented supports Millan's continued detention on the grounds of risk of flight and dangerousness, the Court also determines that, due to delays occasioned by the Government, the length of Millan's pretrial detention has exceeded constitutional limits. Accordingly, the Court is compelled to order Millan's conditional release pending retrial in accordance with the conditions set forth at the conclusion of this Opinion.

## DISCUSSION

To determine whether the length of a defendant's pretrial detention violates the Due Process Clause, the Court must assess: (1) the length of the defendant's pretrial detention; (2) the extent of the Government's responsibility for the trial's delay; and (3) the strength of the evidence upon which the defendant's detention was based. *See United States v. Orena*, 986 F.2d 628, 630 (2d Cir.1993); *United States v. Gonzales–Claudio*, 806 F.2d 334, 341–43 (2d Cir.), *cert. dismissed sub nom., Melendez–Carrion v. United States*, 479 U.S. 978, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986). Applying these factors to the case at hand, the Court finds that further detention in this case would violate Millan's due process rights.

### A. *Length of Pretrial Detention*

In support of Millan's continued detention, the Government relies primarily upon *United States v. Melendez–Carrion*, 820 F.2d 56 (2d Cir.1987) ("*Melendez–Carrion*"), in which the Second Circuit affirmed detention orders entered by the district court even though the defendants had been detained continuously for nineteen months and were facing an an-

---

1. A mistrial was declared in the above-captioned case by Order dated April 16, 1993, 817 F.Supp. 1086 (S.D.N.Y.).

2. Specifically, Magistrate Judge Katz set the following bail conditions: Millan shall (1) post a $1,000,000.00 personal recognizance bond secured by $500,000 in property/cash and co-signed by six financially responsible people; (2)

reside with his common-law wife and children subject to home detention and electronic monitoring; (3) surrender all travel documents; (4) be subject to strict pretrial supervision; and (5) not associate or communicate with witnesses or co-defendants—with the exception of communications necessary to prepare his defense.

ticipated additional thirteen months confinement. According to the Government, *Melendez–Carrion* demonstrates that the Second Circuit has upheld detention "certainly comparable to that faced here by Millan." *See* Letter from AUSA Dietrich L. Snell to the Honorable Shirley Wohl Kram of 6/9/93 (the "Snell Letter"), at 7.

The Court finds this argument unpersuasive. Contrary to the Government's position, the Second Circuit in *Melendez–Carrion* actually found that a period of thirty-two months anticipated detention to "weigh in [defendants'] favor" for due process purposes. *See United States v. Melendez–Carrion*, 820 F.2d at 60. In fact, the court relied exclusively upon two other factors, namely, a determination that the Government was not responsible for the trial's delay and the defendants' clear risk of flight, and not the length of detention, in upholding the constitutionality of nineteen months continuous confinement. *See id.* at 60–62.

Moreover, and perhaps more importantly, the Second Circuit subsequently released Ojeda Rios, the only *Melendez–Carrion* defendant still detained [3], on the grounds that further pretrial detention would violate due process. *United States v. Ojeda Rios*, 846 F.2d 167, 168 (2d Cir.1988) ("*Ojeda Rios*"). Despite, the lack of prosecutorial responsibility for Rios's continued detention and his risk of flight, the Second Circuit found that due process could not "tolerate" more than thirty-two months pretrial detention. *Id.* at 169.

In the case at hand, Millan has been detained for twenty-three months and faces a nonspeculative additional detention of at least seven months (two months pretrial and five months retrial).[4] This period of at least thirty months pretrial confinement is virtually indistinguishable from the thirty-two months found unconstitutional by the *Ojeda Rios* court. *See United States v. Ojeda Rios*, 846 F.2d at 169. While recognizing that no "bright line" test exists for determining a permissible period of pretrial confinement, *see United States v. Gonzales–Claudio*, 806 F.2d at 340 (advocating a case-by-case assessment), the Court is strongly swayed by *Ojeda Rios*, as well as the overwhelming weight of caselaw, censuring such lengthy detention. *See United States v. Gonzales–Claudio*, 806 F.2d at 341 (fourteen months pretrial detention found to violate due process); *United States v. Theron*, 782 F.2d 1510, 1516 (10th Cir.1986) (four months detention constitutes a due process violation); *United States v. Zannino*, 798 F.2d 544, 548 (1st Cir.1986) ("in many, perhaps most cases, sixteen months would be found to exceed the due process limitation on pretrial confinement."); *United States v. Gallo*, 653 F.Supp. 320, 334 (E.D.N.Y.1986) ("any pretrial detention of more than 90 days exceeds what Congress contemplated, and a pretrial detention of more than six months should flash a warning that a violation of due process has probably occurred."); *United States v. Gatto*, 750 F.Supp. 664, 676 (D.N.J.1990) (continued detention beyond fifteen months considered punitive). As the Second Circuit explicitly recognized, "at some point and under some circumstances, the duration of pretrial detention becomes unconstitutional", *see United States v. Gonzales–Claudio*, 806 F.2d at 339, and further detention of an individual presumed innocent cannot be countenanced. With this standard in mind, the Court finds that pretrial confinement of approximately thirty months is a factor weighing heavily in Millan's favor.

---

**3.** The other *Melendez–Carrion* defendants were conditionally released at various points short of thirty-two months.

**4.** The Government's calculation that Millan faces only twenty-eight months pre-verdict incarceration, *see* Snell Letter at 7, is clearly idealistic. Although the Government contends that Millan's trial is "imminent" and will commence "at any time", *see* Snell Letter at 7, the Court disagrees. No trial date has been set in the *Millan* case, or will be set, while the investigation into police misconduct, which resulted in the April 16, 1993 mistrial, is ongoing. To date, the Government has been unable to provide the Court with an estimate as to when the investigation will conclude. Until that time, retrial is not possible. Accordingly, although the Court accepts the Government's September 1, 1993 retrial date, for purposes of this Opinion, in actuality, the true length of Millan's pretrial detention is inestimable and may easily continue beyond thirty months. *See United States v. Gallo*, 653 F.Supp. 320, 344 (E.D.N.Y.1986) ("indeterminacy of duration should weigh in favor of release, rather than against it.").

## B. *Delay Attributable to the Government*

The second factor the Court must assess to determine whether Millan's pretrial detention exceeds due process limits, is the extent to which the prosecution bears responsibility for the delay in starting the trial. *See United States v. Orena*, 986 F.2d at 630; *United States v. Gonzales–Claudio*, 806 F.2d at 341–43. In weighing this factor, the Court "need not determine with precision the amount of pretrial delay attributable to the prosecution, nor assess the extent to which the Government may have been at fault in contributing to the delay. It suffices . . . to conclude that the Government, even if not deserving of blame, bears a responsibility for a portion of the delay significant enough to add considerable weight to the defendants' claim that the duration of detention has exceeded constitutional limits." *United States v. Gonzales–Claudio*, 806 F.2d at 342–43. Turning to the extent of the Government's responsibility for delay, the Court finds that this factor also weighs in Millan's favor.

For purposes of deciding this issue, the Court notes the following undisputed facts. On March 24, 1993, Millan was severed from his co-defendants due to a conflict of interest involving his attorney, Michael Pollack. Thereafter, on April 16, 1993, the Court declared a mistrial as to Millan's co-defendants on the grounds of manifest necessity. *See* Order, dated April 16, 1993. Specifically, the Court found that a mistrial was necessary as: (1) the Government had improperly opened by making statements which could not be supported at trial; (2) the investigation underlying the *Millan* case and leading to the issuance of multiple wire taps and search warrants was tainted by evidence of law enforcement misconduct during the time of, and in connection with, the *Millan* investigation; (3) the Government failed to disclose evidence of alleged police misconduct to either the Court or defense counsel in a timely fashion; (4) the Government could not account for the whereabouts of certain evidence; and (5) the ongoing investigation into the alleged misconduct of the officers at issue

was likely to reveal additional instances of misconduct affecting the case. *Id.*

In response to these undisputed findings, the Government suggests that Millan's decision to be severed from his co-defendants on March 24, 1993, and his failure to resolve the question of his legal representation,[5] relieves the Government of all responsibility for the delay. *See* Snell Letter at 9 ("it would be altogether inappropriate to hold the Government—which obviously did not cause Mr. Pollack to incur a conflict of interest—responsible for the delay in Millan's trial."). The Court finds this argument unavailing.

First, by Order dated March 29, 1993, 817 F.Supp. 1072 (S.D.N.Y.), the Court held the Government responsible for the sequence of events resulting in Millan's severance. Noting the Government's failure for some six weeks to alert the Court to the conflict burdening Millan's counsel, the Court found that:

> Although the Government received information on January 25, 1993, indicating that Pollack's continued representation of Millan in this district was subject to a conflict of interest, it failed to notify the Court of the situation until March 23, 1993. *See* Memorandum to Files from Ronald G. Gardella, dated March 23, 1992. As the Government itself concedes, "timely disclosure of the conflict of Millan's counsel would have afforded Millan sufficient opportunity to select alternative counsel so that he could proceed to trial with other defendants." Letter from Dietrich L. Snell to the Honorable Shirley Wohl Kram, dated 3/24/93, at 3. Nevertheless, this was not done.

Order, dated March 29, 1993, at 1086.

Second, as noted by the Magistrate Judge, Millan is no longer severed from his co-defendants. *See* Hearing Tr. at 42. As a result, regardless of Millan's failure to resolve his counsel problems, his retrial, like that of his co-defendants, is now precluded by the same ongoing investigation into police corruption which resulted in the April 16, 1993 mistrial. Until that investigation is

---

5. In substance, although Millan was directed to obtain new counsel, he has opted, instead, to "wait and see" in the hopes that Mr. Pollack's conflict will be resolved and his continued representation possible.

complete and the extent of corruption known, neither Millan nor his co-defendants can be retried. Accordingly, Millan's failure to retain new counsel is largely irrelevant.

Third, despite the Government's representation that it is not significantly responsible for the mistrial, *see* Snell ·Letter at 8, the Court ·finds that the Government is primarily, if not solely, responsible for the trial's delay since March 1993. As noted in the Court's prior opinions, dated March 29 and April 16, 1993, the Government's failure to notify the Court regarding Pollack's conflict or bring the allegations of police misconduct to the Court's attention before opening arguments resulted in Millan's severance and the subsequent mistrial. *See* Order, dated April 16, 1993, at 5; *see also* Order, dated March 29, 1993, at 29 ("the Government has acted inexcusably in disrupting and delaying the *Millan* trial."); Order, dated May 21, 1993, at 3–4 (Government found responsible for causing mistrial and delaying retrial). Thus, as the Government is clearly responsible for a portion of the pretrial delay, this factor also weighs in favor of ordering Millan's conditional release.

## C. *The Strength of the Evidence Upon which Detention was Based*

Turning to the third factor, the Court must assess whether Millan constitutes either (1) a risk of flight or·(2) a danger to the safety of other persons and the community and (3) whether there are "conditions of release that will reasonably assure. the appearance of [Millan] as required and the safety of any other person and the community." *United States v. Orena,* 986 F.2d at 632 (quoting 18 U.S.C. § 3142(g)). In deciding this issue, the Court will consider the nature and circumstances of the alleged offense, the weight of the evidence against the accused, the history and characteristics of that person, the risk of flight and the danger to any person or the community that would be posed by the defendant's release. *Id.; see also United States v. Khashoggi,* 717 F.Supp. 1048, 1049 (S.D.N.Y. 1989). If the Court concludes by clear and convincing evidence that "no .condition or combination of conditions will reasonably assure ... the safety of any other person and

the community," detention shall be ordered. *Id.*

### 1. **Risk of Flight**

The Government points to four factors evidencing Millan's risk of flight: (1) Millan attempted to flee when he was first apprehended by law enforcement officers; (2) Millan has strong incentive to flee as he is facing mandatory life imprisonment if convicted of conducting a continuing criminal enterprise; (3) Millan has a passport and has travelled extensively in South America; and (4) Millan has substantial wealth stashed in South America.

The Court agrees with the Government's contention that the proffered evidence establishes that Millan accumulated substantial wealth as a result of his many·years in the heroin business. Specifically, a search warrant executed on August 3, 1991, yielded among other things, records documenting over $91 million worth of heroin distributed by the Blue Thunder organization between June 1987 and August 1991. The same records indicate that the organization received a total of more than $65 million in cash from the sale of heroin during the same forty month period. In addition, at a hearing held before the Court on June 7, 1993, Heriberto Rosario, Millan's confidante, testified that Millan received 35% of Blue Thunder's gross heroin sales, and that, according to Millan ·himself, had money in Argentina and other hiding places not accessible to him from jail. Transcript of Bail Appeal, dated June 3 and 7, 1993 (the "Appeal Tr."), at 136–39.

Despite this evidence, however, the Court finds that Millan has no history of attempting to avoid apprehension by law enforcement officials and that there are countervailing factors decreasing the risk of flight. ·First, Millan's ties to the community, "the starting point for assessing risk of flight", are strong. *See United States v. Gonzales–Claudio,* 806 F.2d at 343. Millan is a United States citizen who was born in New York and has lived his entire life in New York City. *See* Pretrial Services Report, dated June 3, 1993, at 2. In addition, all Millan's close relatives, including his common-law wife, three children, mother, sister, grandmother, aunts and uncles, live in

New York. *Id.* Millan has no additional family or close relatives outside the United States. *Id.* Millan also owned several companies and properties in the New York area, many of which were seized by the Government. *Id.* Thus, Millan has substantial ties to this area.

In addition, despite Millan's frequent visits to South America, he has never engaged in activity evidencing a likelihood of flight. For instance, there is no finding and no evidence that Millan ever fled the jurisdiction, failed to honor court orders, or used false identities, aliases, or travel documents.[6] Furthermore, the Government has now seized Millan's passport, making further travel abroad difficult, if not impossible.

Moreover, the factors relied upon by the Government, namely, Millan's substantial wealth, trips to South America, and alleged criminal conduct, are not as compelling as those in *United States v. Ojeda Rios,* 846 F.2d 167 (2d Cir.1988), in which the Second Circuit ordered the defendant's conditional release. In that case, although defendant Ojeda Rios posed a clear risk of flight in that he: (1) was head of military operations for "Los Macheteros" (the machete wielders), a paramilitary terrorist group dedicated to achieving the independence of Puerto Rico and responsible for numerous acts of murder, robbery, destruction of property, theft of explosives and kidnapping[7]; (2) was known by various code names and aliases; (3) had obtained fake drivers' licenses and passports; (4) had traveled extensively in Puerto Rico and other foreign countries; (5) forcibly resisted arrest by wounding an arresting officer; and (6) lived "underground" without ties to the community, *see United States v. Me-*

*lendez–Carrion,* 820 F.2d at 57–58, 61, the Second Circuit held that his risk of flight did not outweigh a period of confinement, namely thirty-two months, which had exceeded constitutionally permissible limits.

Similarly, in *United States v. Gonzales–Claudio,* 806 F.2d at 341, the Second Circuit found that detention which lasted fourteen months and, without speculation, was scheduled to last considerably longer, was a denial of due process. In that case, the court held that even though the defendants lived all their lives in Puerto Rico, had code names in the Los Macheteros organization, participated in paramilitary operations, including a raid in which two United States sailors were killed, and used false names, their risk of flight was not established "to a degree sufficient to render continued detention within constitutional limits." *Id.* at 343. In reaching its decision, the Second Circuit recognized that:

> the release of these defendants upon reasonable conditions creates a risk that they may flee. We are not indifferent to that prospect. But the enforcement of all constitutional restraints upon government in its efforts to administer the criminal law entails risks.... In this case the enforcement of due process limits upon the duration of preventive detention creates the risk that a person accused of crime may avoid a trial that might result in conviction and punishment. That risk is serious, but of at least equal gravity is the preventive detention for fourteen months of defendants who are presumed innocent and whose trial to determine guilt or innocence

6. Although the Government contends that Millan has a "history of attempting to avoid apprehension by law enforcement" in light of a "high speed car chase" preceding his arrest, *see* Snell Letter at 2, 10, the Court finds that a distinction exists between flight to avoid arrest in the first instance, and flight to avoid trial. *See United States v. Stroud,* 893 F.2d 504, 508 (2d Cir.1990) (flight from arresting officers deemed "instinctual" and "natural" rather than a willful attempt to obstruct justice); *United States v. Miranda,* 442 F.Supp. 786, 791 (S.D.Fla.1977) (finding that the greatest risk of flight is prior to arrest and that flight during this period is not influential in determining whether the defendant will flee again); *see also United States v. Alexander,* 742 F.Supp.

421, 422 (N.D.Ohio 1990) (distinction noted between flight to avoid arrest and risk of flight).

7. Specifically, the court determined that Ojeda Rios played a central role in "La Gaviota", the attack on Muniz Air Base, in Puerto Rico, in which nine A–7 aircraft were destroyed at a cost of $40 million; had participated in an anti-tank rocket attack on a federal courthouse in Hato Rey, Puerto Rico; and helped plan "El Chivo", a plan to free and then assassinate an incarcerated former Macheteros member suspected of being an informant. *United States.v. Melendez–Carrion,* 820 F.2d at 57–58.

will not even begin until detention has lasted eighteen months..

*Id.*

Likewise, in the instant matter, the Court recognizes the very real potential that Millan will flee. Clearly, the serious nature of the crimes charged, the central role Millan allegedly played in heading the organization responsible for those crimes, his obvious incentive to flee in light of a potential life sentence, and the extent and weight of the evidence indicating his culpability, all point towards a serious risk of flight in the case at hand. Nonetheless, the Court also recognizes that the Due Process Clause requires that at some point risk of flight must be accepted in order to avoid a deprivation of constitutional rights. That point has been reached. Thus, although Millan may attempt to flee rather than attend his trial, this risk is not sufficient to render continued detention within constitutional limits.

### 2. Danger to the Community

The Second Circuit has observed that "the constitutional limits on a detention period based on dangerousness to the community may be looser than the limits on a detention period based solely on risk of flight," as release of a dangerous individual risks potential injury to others whereas release with a flight risk potential entails "only the loss of a conviction." *United States v. Orena,* 986 F.2d at 631. The Second Circuit has also determined, however, that danger to the community must be supported by "clear and convincing evidence." [8] *United States v. Chimurenga,* 760 F.2d 400, 405 (2d Cir.1985). "To find danger to the community under this standard of proof requires that the evidence support such a conclusion with a high degree of certainty." *Id.*

Focusing on Millan's danger to the community, the Government contends that the evidence concerning Millan's dangerousness is "compelling." Snell Letter at 11. Specifical-

ly, the Government relies on the testimony of two witnesses, Klepper Duche and Heriberto Rosario, both of whom participated in the Blue Thunder distribution business. On June 3, 1993, Duche testified that Millan and Nelson Rodriguez ("Rodriguez") were partners in the heroin business. Duche also testified that Millan tried to arrange bail for Rodriguez in connection with an arrest for murder. Appeal Tr. at 46–48. Duche further testified that following his own release from prison in 1989, Millan recruited him to return to the heroin business. *Id.* at 51–56. Thereafter, Millan approached Duche about a "problem" which Millan wished to solve by hiring a "trigger man" to "take somebody out." *Id.* at 57. Following their arrest in August 1991, in connection with the Blue Thunder case, Millan commented to Duche that "people that I think, you know, are cooperating, they're not really thinking good, they're not really thinking about their families." *Id.* at 67.

On June 7, 1993, Rosario provided testimony that in 1989, he assisted Millan and others in an "enforcement action" at a "spot" on Gerard Avenue, an action that culminated with Rosario shooting at a rival drug dealer. *Id.* at 120–22. Rosario also testified that he and Millan agreed to place a $100,000 contract on a rival drug dealer who had declared "a personal war on Blue Thunder." *Id.* at 123–25. Rosario further testified as to a post-arrest conversation with an associate of Millan's about resuming the distribution of Blue Thunder heroin. *Id.* at 140. Rosario also recalled a post-arrest conversation in which Millan indicated "that he wanted to go to trial because he wanted to see who testifies against him," and remarked "that whoever testifies, that they are putting their family in danger." *Id.* at 138, 154.

In spite of this testimony, the Court finds no evidence that Millan presents a danger to any specific individual. *See* S.Rep. at 12–13, 1984 U.S.Code Cong. & Adm.News, 3195

---

8. Although the Government accurately contends that there is a statutory presumption, pursuant to the Bail Reform Act, 18 U.S.C. § 3142, whereby anyone accused of a federal drug crime, having a sentence of more than ten years, is presumed to be a risk of flight and danger to the community so that no set of conditions can reasonably as-

sure the community's safety, *see* Appeal Tr. at 5, the Government still maintains the burden of establishing dangerousness by clear and convincing evidence. *United States v. Chimurenga,* 760 F.2d at 403, 405 (noting that the burden of persuasion rests with Government even where the rebuttable presumption applies).

(noting that dangerousness to any person "is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern"). Moreover, Millan has no prior convictions involving violent offenses. Indeed, despite testimony that Millan threatened the families of cooperating witnesses, both Duche and Rosario frankly admit that Millan has never threatened or intimidated either them or their families. Appeal Tr. at 74–76, 78, 154; *see United States v. Gallo,* 653 F.Supp. at 332–33 (any detention based on a threat to a witness must take into account the likelihood that threat will be carried out). In addition, although both Duche and Rosario testified as to numerous acts of violence with which they were associated, (*see* Appeal Tr. at 34–36 (shooting), 37–39 (shootout), 40–42 (beating and shooting), 43–44 (beating), 61–62 (shooting), 119 (shooting), 122 (shooting), 127–28 (contract for murder)), both witnesses had difficulty attributing any specific acts of violence directly to Millan. *See* Appeal Tr. at 173 (noting that Millan "gets others to do his dirty work for him very often.").

Therefore, the principle concern raised by the Government is not the prospect that Millan will cause direct harm to any individual, but rather, that he will return to criminal activity to the detriment of the community. *See United States v. Leon,* 766 F.2d 77, 81 (2d Cir.1985) ("it is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger'"). Thus, the precise question raised, is whether the Government has shown by clear and convincing evidence that Millan represents a danger to the community by virtue of the risk that he will resume his criminal activities in narcotics trafficking.

In answering this question, the Court, while cognizant that there is convincing evidence that Millan previously engaged in a continuing criminal enterprise in violation of 21 U.S.C. § 848, rejects the notion that this evidence, by itself, supports the inference that Millan will return to his criminal activities and should be detained. While such evidence establishes probable cause to believe that Millan committed the crimes charged, it does not establish a risk of recidivism sufficient to order Millan's further detention. The Court also notes that the offenses charged are Millan's first and that his alleged misconduct occurred over two years ago.

On the other hand, the Court does find that the charges in the indictment are serious and that the Government has produced evidence at the hearings to demonstrate clearly and convincingly that Millan associated with dangerous, violent people who are likely to repeat their criminal conduct. Specifically, the Court takes notes that both Duche and Rosario, though arrested, engaged in additional criminal conduct following their arrests. For example, subsequent to his incarceration in this case, Rosario has been prosecuted for accepting contraband. Appeal Tr. at 143–45. Similarly, following his March 1987 arrest for drug trafficking, Duche resumed his heroin business with Millan. Appeal Tr. at 52–54.

Nonetheless, the Court believes that continued detention, beyond twenty-three months, of a person presumed to be innocent is fundamentally unfair and violates due process. At this point in time, Millan's individual due process rights outweigh his potential risk of flight and dangerousness. Thus, given the length of detention that has already occurred and the non-speculative estimate of future confinement, the Government's responsibility in delaying this trial, and the facts concerning risk of flight and danger to the community, the Court finds that continued detention beyond twenty-three months exceeds due process. Accordingly, the Court imposes a set of conditions for release which will reasonably assure the safety of the community, as well as Millan's future appearance at trial.

### Conclusion

For the reasons set forth above, the Court deems it appropriate that Millan shall be released from pretrial confinement subject to the following bail conditions: Millan shall (1) post a $1,000,000.00 personal recognizance bond secured by $500,000.00 in real property and $100,000.00 cash and the signatures of six (6) financially responsible individuals, two of whom must be family members; (2) not

associate, engage in business with, or communicate with any other named defendants prior to trial except in the presence of his lawyer to prepare his defense; (3) not commit any crimes during the period of his release; (4) report daily by telephone to Pretrial Services: (5) report personally on one day of each week to Pretrial Services; (6) reside with his common-law wife and submit to home detention and electronic monitoring, with limited exceptions for prearranged visits with his attorney for the purpose of assisting in the preparation of his defense; and (7) surrender his passport and all other travel documents, including the passport and travel documents of his common-law wife, and shall not apply for any other travel documents during the pendency of this case.

Pursuant to 18 U.S.C. § 3142(h)(2), the Court further advises Millan that violation of one or more of these conditions of release will result in the immediate issuance of a warrant for his arrest. If Millan fails to appear before any court or judicial officer as required, his bond will be forfeited and an additional criminal charge, bail jumping, may be instituted against him.

SO ORDERED.