**UNITED STATES of America, Plaintiff,**

v.

**Terry Lynn NICHOLS, Defendant.**

**No. M–95–105–H.**

United States District Court, W.D. Oklahoma.

June 6, 1995.

Patrick M. Ryan, U.S. Attorney's Office, Oklahoma City, OK, for U.S.

Ronald G. Woods, Houston, TX, Michael E. Tigar, Austin, TX, for defendant.

### ORDER

DAVID L. RUSSELL, Chief Judge.

Before the Court is the motion of Defendant Terry Lynn Nichols for an order releasing him upon a number of specified conditions pursuant to the Bail Reform Act, 18 U.S.C. § 3142 *et seq.* and the Fifth and Eighth Amendments to the United States Constitution. The motion was filed following Defendant's request, at his preliminary hearing on May 18, 1995, for an opportunity to brief the detention issue. Pursuant to agreement of the parties and consent of the Defendant, Defendant was given seven (7) days in which to file his brief and the Government was given seven (7) days in which to respond. The Government's response brief was filed on June 1, 1995. Defendant consented to his detention and to postponement of the detention hearing until such time as the briefing was completed.

▉ The Court has reviewed Defendant's motion, memorandum in support of the motion, the declaration of Michael E. Tigar, Defendant's counsel, in support of the motion, the Government's response brief, Defendant's reply memorandum and, as the Court previously advised the parties, the Court has read the transcript of the proceedings had on May 18, 1995 (the Preliminary Hearing) and the exhibits admitted into evidence at the Preliminary Hearing. The Court conducted a detention hearing[1] on June 2, 1995, pursuant to 18 U.S.C. § 3142(f). Both the United States and the Defendant presented evidence[2] and made oral argument at the de-

---

1. The detention hearing would ordinarily be held by the United States Magistrate Judge assigned to the case with *de novo* review of the magistrate's detention or release order by a district judge available. *See* 18 U.S.C. § 3145. In this case, Defendant's counsel requested that the detention hearing be conducted by me, Chief Judge for the Western District of Oklahoma, there being no district judge yet assigned to the case, to eliminate one level of review and expedite an appeal to the Tenth Circuit Court of Appeals in the event Defendant was ordered detained. Both parties consented to this procedure.

2. In making its findings and determinations herein, the Court can and does rely on information or what is referred to as "evidence" herein presented at the Preliminary Hearing and at the detention hearing which would not be considered competent, admissible evidence for trial purposes. *See* 18 U.S.C. § 3142(f); *United States v. Fortna*, 769 F.2d 243 (5th Cir.1985); *United States v. Miller*, 625 F.Supp. 513, 521 (D.Kan. 1985).

tention hearing. The Court now enters its findings of fact and conclusions of law.

1. Defendant Terry Lynn Nichols is charged by Criminal Complaint with the offense of maliciously damaging and destroying by means of fire and an explosive a building, vehicle, and other personal and real property in whole or in part owned, possessed and used by the United States and departments and agencies thereof in violation of Title 18, United States Code, Sections 844(f) and 2.

■ 2. The Government has not filed a statutory notice of its intent to seek the death penalty. However, the Court takes judicial notice of the fact that the destruction of the Alfred P. Murrah Federal Building resulted in the deaths of 168 people. Thus, the offense with which Defendant is charged is an "offense for which the maximum sentence is life imprisonment or death." 18 U.S.C. § 3142(f)(1)(B). *See* 18 U.S.C. § 844(f).

■ 3. Defendant is charged with committing or aiding or abetting the commission of a crime of violence. *See* 18 U.S.C. § 3156(a)(4). Although this matter is before the Court on Defendant's motion for release rather than on the Government's motion, the parties agree and the Court concludes that the Government has the burden of proving by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the safety of any other person and the community," 18 U.S.C. § 3142(f), *see United States v. Salerno,* 481 U.S. 739, 742, 752, 107 S.Ct. 2095, 2098, 2104, 95 L.Ed.2d 697 (1987), or of proving by a preponderance of the evidence that the Defendant poses a risk of flight. *See United States v. Gebro,* 948 F.2d 1118, 1121–1122 (9th Cir.1991); *United States v. Carlos,* 777 F.Supp. 858, 860 (D.Kan.1991). *Accord* Order and Judgment, *United States v. Reyes– Rodriguez,* Case No. 93–2241 (10th Cir. Oct. 7, 1993) (unpublished but noted at 7 F.3d 1046) (1993 Westlaw 394870).

4. In determining whether there are conditions of release that will reasonably assure the appearance of Defendant as required and the safety of any other person and the community, the Court is required to and does take into account available information concerning the factors set out in 18 U.S.C. § 3142(g)(1) through (4) which are incorporated herein by reference.

■ 5. With respect to the first factor in Section 3142(g), the nature and circumstances of the offense charged are the malicious damaging and destruction by means of fire and an explosive device of a federal building which resulted in the deaths of 168 people, and extensive property damage, or aiding or abetting others in the commission of such offense. The offense charged is a crime of violence.

6. The evidence that Defendant Terry Lynn Nichols at least aided and abetted others in the commission of the offense charge is entirely circumstantial in nature but there is extensive circumstantial evidence that Defendant at least aided or abetted others in the commission of the offense. The weight of such circumstantial evidence against the Defendant is heavy. That circumstantial evidence includes the following:

a. Defendant has known Timothy McVeigh since 1988 and since then Defendant and McVeigh have occasionally lived together and operated a business together selling army surplus items and firearms at gun shows around the country. A United States Magistrate has found that there is probable cause to believe that on April 19, 1995, in Oklahoma City, Oklahoma, Timothy McVeigh committed the offense of maliciously damaging or destroying a building, the Alfred P. Murrah Federal Building which is in whole or in part owned, possessed and used by the United States and departments and agencies thereof.

b. On September 30, 1994, forty fifty-pound bags of ammonium nitrate were purchased from the Mid–Kansas Cooperative Association in McPherson, Kansas, by a "Mike Havens." A receipt for that purchase was found during a search of Defendant's residence on April 22, 1995. That receipt bears the fingerprint of Timothy McVeigh.

c. On September 22, 1994, not quite a week before the purchase of ammonium

nitrate described in subparagraph b, a storage unit was rented at Herington, Kansas, where Defendant resides, in the name of Shawn Rivers. On Tuesday, April 18, 1995, McVeigh told the Defendant that if McVeigh did not pick up items he had in that storage unit Defendant should do it for him. On April 20, 1995, the day after the bombing, Defendant removed items, including a rifle, from the storage unit.

d. On October 18, 1994, forty additional fifty-pound bags of ammonium nitrate fertilizer were purchased from Mid–Kansas Cooperative Association in McPherson, Kansas, by a "Mike Havens," who was driving a dark-colored pickup with a light-colored camper shell. On October 17, 1994, one day prior to that purchase, a storage unit identified as unit no. 40, was rented at Council Grove, Kansas, in the name Joe Kyle. A document found during the search of Defendant's home refers to the location of this storage unit and the name Joe Kyle.

e. On November 7, 1994, another storage unit, identified as unit no. 37, was rented in Council Grove, Kansas, in the name of Ted Parker. A document found at Defendant's home bears the location of this storage unit and the name Ted Parker.

f. In a letter dated on or about November 22, 1994, the day Defendant left the United States for a visit to the Philippines, Defendant wrote McVeigh that he would be getting the letter only in the event of Defendant's death and that McVeigh should clear everything out of "CG 37" and "liquidate 40" and advises that McVeigh is on his own and to "Go for it!!" There is information that "CG 37" refers to storage unit no. 37 in Council Grove and that "liquidate 40" refers to storage unit no. 40 in Council Grove.

g. On April 15, 1995, Defendant purchased diesel fuel from a Conoco service station in Manhattan, Kansas. On April 16, 1995, Defendant purchased an additional 21.59 gallons of diesel fuel from a Conoco station in Junction City, Kansas.

h. On April 16, 1995, Defendant drove to downtown Oklahoma City to pick up Timothy McVeigh and was in the vicinity of the Murrah Building at that time.

i. A Ryder truck, identified as the kind of vehicle containing the explosive that damaged the Alfred P. Murrah Building, was observed parked behind Defendant's home in Herington, Kansas, during the evening of April 17, 1995.

j. Defendant owns a dark blue 1984 GMC half-ton diesel pickup with a white topper or camper shell. On Tuesday, April 18, 1995, Defendant met McVeigh in Junction City, Kansas, where Defendant said he loaned that pickup truck to McVeigh for approximately 5 hours while Defendant attended an auction.

k. On April 17 or 18, 1995, an older model pickup with a camper shell was seen backed up to the storage unit no. 2 in Herington, Kansas. During the week of April 17, 1995, a Ryder truck was also seen backed up to the east end of the storage shed in Herington, Kansas, near unit no. 2.

l. On the morning of April 18, 1995, a witness observed a yellow Ryder truck and a dark blue or brown Chevrolet or GMC pickup truck, with something white, possibly a camper shell, on the back of the pickup, parked next to each other in an unpaved area at the Geary State Fishing Lake, approximately six miles south of Junction City, Kansas. The vehicles were parked there for several hours, according to the witness. On April 28, 1995, the witness took an FBI agent to the area where the witness had observed the two vehicles parked. There the FBI agent observed a circular area of brown vegetation surrounded by green vegetation and detected an oily substance and the odor of diesel fuel while inspecting the area of brown vegetation.

m. Ammonium nitrate, ground ammonium nitrate, fuel oil and primadet core can be used in the manufacture of a bomb. Defendant knows how to make a bomb by mixing ammonium nitrate with

diesel fuel which could be detonated with the blasting caps.

n. Defendant told FBI agents that he had rented storage facilities in Kansas and Nevada and that he hoped that if agents searched his home they would not mistake household items for bomb-producing materials. Defendant told agents that he had had ammonium nitrate stored at his residence until Friday, April 21, 1995, at which time he put the ammonium nitrate on his yard as fertilizer after reading in several newspapers that ammonium nitrate was used in the Oklahoma City bombing.

o. During a search of Defendant's home and garage on April 22, 1995, pursuant to a search warrant obtained that date and Defendant's consent, the following items were found and seized: five 60-foot primadet cords with non-electric blasting caps, a fuel meter which is broken, several containers of ground ammonium nitrate, five gas cans of various sizes, four white barrels with blue lids made from material resembling blue plastic fragments found at the bomb site in Oklahoma City and the receipt for the first purchase of ammonium nitrate described above.

7. Defendant has no criminal history, to the Court's knowledge. There is no evidence that he has a history of drug or alcohol abuse. He voluntarily went to the police station in Herington, Kansas, on April 21, 1995, but did so because he heard law enforcement authorities were looking for him. He has appeared for all court proceedings in this case but was in custody when his appearance was required. Defendant has recently travelled around the country to flea markets and gun shows while residing intermittently since 1993 in Michigan, Nevada, Kansas and the Philippines, sometimes selling military surplus goods and ammonium nitrate at gun shows. There is some evidence that Defendant had business cards in his own name printed on April 17, 1995, with the intent of running this business of reselling military surplus goods and ammonium nitrate on a more permanent and formalized basis. Defendant has, however, used aliases to rent storage lockers in Kansas. Numerous firearms and anti-government literature were found in a search of Defendant's home and garage. Although Defendant served in and was honorably discharged from the Army, he has since disclaimed United States and Michigan citizenship and has declared himself in writing to be "Foreign" and a "Non-Resident Alien."

Defendant's former wife and son reside in Las Vegas. His current wife has returned to the Philippines, of which she is a citizen. Defendant's brother, father, mother and sister all apparently live and work within an approximately twenty-mile radius near Decker, Michigan. Defendant's mother and sister attended the detention hearing. They are willing to assume custody of the Defendant and the responsibility of insuring that he not flee and that he appears when required. His attorney Michael E. Tigar is also willing to assume responsibility for his whereabouts and that he appear when required.

The Court has no relevant information concerning Defendant's physical or mental condition. The only information it has concerning Defendant's financial resources is that Defendant executed an affidavit as to his financial inability to employ counsel and requested that the Court appoint counsel on his behalf, which has been done.

Defendant was not on probation, parole or on other release pending trial, sentencing, appeal or completion of sentence at the time of the alleged offense or at the time of his arrest.

8. With respect to the fourth factor listed in 18 U.S.C. § 3142(g), "the nature and seriousness of the danger to any person or the community that would be posed by the person's release," there is not only probable cause to believe that Defendant committed or aided and abetted the commission of the most devastating bombing—in terms of loss of lives—in the peacetime history of this country, but, the weight of the evidence that he committed that offense is great. Indeed, the evidence, adduced at the preliminary hearing, considered as a whole, is clear and convincing. Defendant has admitted that he knows how to make a bomb by blending ammonium nitrate with diesel fuel. Ground

ammonium nitrate, five 60–foot primadet cords with non-electric blasting caps and a broken fuel meter were found in a search of Defendant's home and garage. These items can be used in the construction of bombs. Thirty-three firearms were also found in the search of Defendant's home and garage. Defendant has frequented gun shows and has used aliases. The very nature of the offense with which Defendant is charged raises a strong inference of animosity toward the federal government. Anti-government literature and audio and video-tapes were found in the search of Defendant's home and garage. Defendant has in writing disclaimed his United States citizenship and that he is subject to its laws and its jurisdiction. The enormity of the offense with which Defendant is charged and of which there is clear and convincing evidence that he committed, the clear inference that it was motivated by animosity toward the federal government, evidence that he has disclaimed his United States citizenship and has claimed not to be subject to its laws and jurisdiction, and Defendant's history of possession of tools of violence all point to a clear and serious risk of danger to the community, particularly the community of federal employees, that would be posed by Defendant's release.

## Risk of Flight

9. The Court finds by a preponderance of the evidence that Defendant poses a substantial risk of flight and that no condition or combination of conditions of release will reasonably assure the appearance of the Defendant as required.

The prospect of a lengthy prison term, life imprisonment or the death penalty provides Defendant with a great incentive to flee. *See*, e.g., *United States v. El–Gabrowny*, 35 F.3d 63, 65 (2nd Cir.1994). Defendant has displayed a lack of regard for the laws of this country, declaring himself not subject to its laws or its jurisdiction. He has demonstrated a willingness to conceal his identity by the use of aliases. Although he has a "close loving and supportive relationship with his son, Josh" and family members and neighbors in the Decker, Michigan area are willing to provide him with employment and assume

his custody, Tigar Declaration at ¶ 5, his wife, who is pregnant, and his twenty-two month old daughter, have returned to the Philippines where his wife's family also apparently resides. Defendant has no recent employment history in Michigan or any history of stable permanent employment anywhere and Defendant has in the past declared himself no longer a "citizen of the corrupt political corporate State of Michigan."

Evidence and information pertaining to all three factors relevant to the risk of flight, 18 U.S.C. § 3142(g)(1)(2), and (3) point to a serious risk of flight, particularly that germane to the first two factors. While there is some countervailing evidence of Defendant's personal history and characteristics—for example, the fact that he voluntarily turned himself in when he learned authorities were looking for him, his honorable discharge from the military, his lack of any criminal history and his family and community ties, primarily evidenced by their willingness to provide him with work, and assume responsibility for his custody—which militates against a finding that Defendant poses a substantial risk of flight, that evidence is outweighed by evidence of the first two factors and other adverse evidence with respect to the third factor described above.

Given the serious flight risk posed by Defendant, the only condition which Defendant proposes which could potentially provide a significant deterrent to flight is the wearing of an electronic monitor. However, as several courts have recognized, "[m]onitory equipment is easily rendered inoperative or becomes so by mechanical failure." *United States of America v. Orena*, 986 F.2d 628, 632 (2nd Cir.1993), *quoted in United States v. Masotto*, 811 F.Supp. 878, 883 (E.D.N.Y. 1993). *See also United States v. Gotti*, 776 F.Supp. 666, 673 (E.D.N.Y.1991).

## Danger to the Community

10. The Court finds that there is clear and convincing evidence that Defendant poses a danger to the community and to federal law enforcement agents and that no condition or combination of conditions of release will reasonably assure the safety of the

community and of federal employees in particular.[3] This finding is based upon the following facts of which there is clear and convincing evidence:

    a. The offense Defendant is charged with committing or of aiding or abetting its commission is a crime of violence unparalleled in United States history in terms of the resulting loss of lives, injuries and property destruction, of which facts the Court takes judicial notice.

    b. There is probable cause to believe and clear and convincing evidence that Defendant committed or aided or abetted the commission of the crime that he is charged with committing, even crediting as true information that he was not in Oklahoma City at the time of the explosion.

    c. Defendant has a history of possessing a large number of firearms, ammonium nitrate, ground ammonium nitrate, diesel fuel oil, a fuel meter, detonator cord and blasting caps, which can be used in constructing bombs. Defendant has admitted that he knows how to make a bomb by combining ammonium nitrate and fuel oil.

    d. Defendant has in the recent past disavowed that he is subject to the laws and the jurisdiction of the State of Michigan and of the United States, evidencing a lack of respect or regard for the laws of the State of Michigan and of the United States.

    e. Defendant harbors animosity toward the federal government.

Against the foregoing facts of which there is clear and convincing evidence are the facts that Defendant apparently has no criminal history, was honorably discharged from the military and voluntarily "turned himself in" to authorities on April 21, 1995, as well as evidence of family ties and ties to the community near Decker, Michigan, see above, which the Court also credits as true or as supported by clear and convincing evidence,

which the Court considers in determining whether Defendant is a danger to other persons and the community and in determining whether there are conditions of release that will reasonably assure the safety of the community. When those facts are considered and even when the facts listed in subparagraphs d and e are disregarded, the Court finds that there is clear and convincing evidence that Defendant poses a risk of danger to the community and that no condition or combination of conditions of pretrial release can reasonably assure the safety of the community. What the Court has said concerning Defendant's proposed conditions of release in connection with its finding that no conditions of release will reasonably assure Defendant's required appearance, *see* Risk of Flight, above, is equally cogent to this finding.

With respect to the finding in subparagraph b, above, the Court specifically acknowledges that Defendant has presented substantial evidence of his whereabouts and activities during the days immediately preceding and following the bombing and has, through cross examination of Errol Myers at the Preliminary Hearing, offered innocent explanations for Defendant's possession of ammonium nitrate, the fuel meter, diesel fuel and blasting caps and shown that Defendant was truthful in providing information to the FBI. But Defendant's evidence of his whereabouts and innocent activities immediately preceding and following the bombing in Oklahoma City do not preclude his aiding and abetting the commission of the offense charged and does little in the way of providing an alibi to the offense of aiding and abetting the § 844(f) offense. Although there are separate plausible innocent explanations for many of the individual items or pieces of the circumstantial evidence that Defendant committed or aided and abetted the commission of the crime charged, when the circumstantial evidence in its totality or collectively is considered, the weight of the evidence is great: at this point in the case there is clear and convincing evidence that

---

**3.** The Court finds it unnecessary to determine whether probable cause exists to believe that an offense under 18 U.S.C. § 924(c) was committed and that the Defendant committed it and whether the rebuttable presumption under 18 U.S.C. § 3124(e) may be invoked on that basis in this matter, as the Government argues. *See* Brief of the United States in Opposition to Release at pp. 2–3 & note 1.

Defendant committed or aided or abetted the commission of the offense charged.

In accordance with the foregoing, Defendant Terry Lynn Nichols' motion for release of conditions is denied and it is ordered that Defendant be detained pending trial.

It is ordered that Defendant Terry Lynn Nichols be committed to the custody of Attorney General for confinement in the El Reno Federal Correctional Institution separate from persons awaiting or serving sentences or being held in custody pending appeal. It is further ordered that Defendant's court-appointed counsel be given free access to the Defendant at all reasonable hours. It is further directed that upon any future order of a court of the United States or on the request of an attorney for the Government, the Warden of the El Reno Federal Correctional Institution shall deliver Defendant Terry Lynn Nichols to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

**IT IS SO ORDERED.**