**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Stephen QUARTERMAINE,
Defendant–Appellee.**

**No. 90–5276.**

United States Court of Appeals,
Eleventh Circuit.

Oct. 2, 1990.

---

**912**

---

William I. Shockley, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellant.

Samuel I. Burstyn, Robert F. Dunlap, Miami, Fla., for defendant-appellee.

Before HATCHETT and ANDERSON, Circuit Judges, and GODBOLD, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this pretrial detention case, we reverse the district court because the government proved to the required degree that Quartermaine poses a risk of flight and a danger to the community.[1]

### FACTS

On July 6, 1989, law enforcement officers arrested Stephen Quartermaine at his home on an indictment charging him with importation of marijuana and possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 952, 841(a)(1), and 955a.[2] The officers found Quartermaine free-basing cocaine, and he resisted arrest. On July 10, 1989, a grand jury returned a second superseding indictment against

Quartermaine for continuing criminal enterprise and the use of a communication facility to commit a felony in violation of 21 U.S.C. §§ 848 and 843(b).[3]

### A. First Detention Hearing

On July 11, 1989, at the first pretrial detention hearing, the government contended that Quartermaine should be detained because no conditions of release could guarantee the safety of the community or his appearance at trial.[4]

The government presented extensive evidence concerning Quartermaine's risk of flight at the first detention hearing. Documents seized pursuant to search warrants revealed Quartermaine's ownership interest in foreign corporations. Additionally, on two occasions, Quartermaine failed to appear in court on misdemeanor charges. From 1975 to 1989, Quartermaine failed to file income tax returns. According to the government, a bank account in the Cayman Islands in the name of Stephen Quartermaine contained $374,000. The government believed that the Quartermaine family had from $10 to $15 million in assets outside the United States.

In response, Quartermaine proffered that his mother would post her home as collateral for his release. Julie Telleachea, Quartermaine's girlfriend, also expressed a willingness to post her home as collateral. Quartermaine contends that he has not paid taxes because he has not worked in eight years and that he is supported by income from a trust created by his grandfather in 1977.

---

1. We issued our order in this case immediately following oral argument with this opinion to follow.

2. A grand jury in Miami, Florida returned the original indictment in December 1988. The district court ordered the indictment sealed on the motion of the government. A superseding indictment which did not change the original indictment but corrected a technical deficiency was brought within the same week and also sealed on the government's motion.

3. The government brought a third superseding indictment against Quartermaine on December

1, 1989, which expanded the time frame of criminal activity charged from four years to nine years.

4. The Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.,* provides that:

> The judicial officer shall order the pretrial release of the person ... unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.

18 U.S.C.A. § 3142(b) (West Supp.1990).

The government also presented the following evidence concerning Quartermaine's reputation for violence and danger to individuals and the community. Quartermaine resisted arrest, and two loaded firearms were seized from his bedroom. According to the government, twelve witnesses who were interviewed, or who testified before the grand jury, expressed fear of Quartermaine. Three witnesses expressed strong reservations concerning their safety and the safety of their families. The government represented that none of the witnesses had agreed to testify publicly prior to trial, and most were reluctant to testify at all. One confidential source stated that Quartermaine had been armed on every occasion when the source had seen him.

In 1979, Broward County sheriff's deputies arrested Quartermaine at his ranch, called the "High Time," for beating his wife. When the deputies restrained Quartermaine, he broke away from them and began to beat her again in the presence of the officers and his children. When the deputy asked Quartermaine about his occupation, Quartermaine responded, "I'm a smuggler, now you go and prove it." When the deputy asked Quartermaine's wife about his occupation, she stated that the officers should ask Customs or the Drug Enforcement Agency. On March 8, 1989, Police Officer Peter Gates arrested Quartermaine for beating his daughter in the parking lot of a hotel. When Gates attempted to separate them, Quartermaine lunged at his daughter screaming, "I'll kick her ass anytime I feel like it." When Gates inquired about his address, Quartermaine responded, "I don't give a shit about this United States. Honduras is my country, and that's where I'm going to be."

Quartermaine sought to rebut this evidence in several ways. He argued that the fact that he did not attempt to use the guns in his bedroom to resist arrest contradicts the implication that he is a violent person. Quartermaine also explained that the seized weapons belonged to his father, and that the incidents of domestic violence should not be considered indicative of whether he poses a danger to the community.

On September 9, 1989, the magistrate ordered Quartermaine's pretrial detention. The magistrate found that the government failed to prove that Quartermaine presented a risk of flight, but did prove that he posed a danger to the community. The magistrate made the following findings pursuant to 18 U.S.C. § 3142(i):

Whether intentionally or not, the defendant has instilled fear into co-conspirators and others who have agreed to be witnesses for the government.

Even if the defendant never intended to instill fear of himself and was just 'talking,' he nonetheless succeeded in creating an atmosphere where his actions, words, and ownership of weapons led these witnesses to fear for their lives.

From the proffer of the Assistant United States Attorney, the court finds that confidential source ("CS") number 7 has expressed fear of Stephen Quartermaine from events CS # 7 witnessed in the early 1980s. The fear of this witness is a present and strongly held belief, additionally based upon the knowledge that Stephen Quartermaine always carried a weapon.

Confidential source No. 8 received a direct threat from Stephen Quartermaine in connection with a prior investigation, that a family member would be dismembered if CS # 8 testified at any proceeding. No testimony was forthcoming and no injury occurred. These events happened prior to 1985.

Another witness who has strong current reservations about testifying in this matter was in a position to have seen the Quartermaines at work for two years in the early 1980s. This witness, along with CS # 7 and two other witnesses, first expressed their individual fears of testifying twelve to fourteen months prior to the bond hearing, at the time of their respective grand jury testimony.

Another four individuals were interviewed by Assistant United States Attorney Shockley in the two or three months prior to the hearing. One was generally concerned because of the violent reputations of the Quartermaine brothers, and

three expressed strong reservations for themselves and their families.

One of the reasons the investigation was lengthy is because of the reluctance of witnesses to come forward.

The court finds further that Stephen Quartermaine has cultivated a reputation for violence with the result that potential witnesses against him and the enterprise were intimidated from testifying.

### B. Second Detention Hearing

On September 5, 1989, the magistrate held a second detention hearing on Quartermaine's motion. At that hearing, a witness for the government, John Stanton, a retired Pembroke Pines police officer, testified that Quartermaine was a suspect in the January 21, 1981, murder of Harvey McElroy. The investigative file on McElroy's death contained affidavits stating that Quartermaine had fought with McElroy the night of the murder.

At this hearing, Quartermaine proffered testimony that he had a loving relationship with his daughter and that he only struck her in the parking lot because she had run away from home. The daughter was in the courtroom at this hearing, but did not testify. The magistrate again refused to recommend Quartermaine's release, but stated that Quartermaine could renew his motion if the district court granted a continuance. The magistrate considered the length of time Quartermaine would spend in jail a factor in determining whether to recommend his release pretrial.

### C. Third Detention Hearing

On September 12, 1989, the district court granted the government's motion to continue the case, and the following day the magistrate heard Quartermaine's renewed motion. At this hearing, the magistrate emphasized the significance of the continuance, stating that "any practical judge is going to find a correlation between the proposed amount of time pretrial and the government's burden to establish dangerousness to the community or risk of flight."

When the magistrate indicated his intention to release Quartermaine, the government presented new evidence that Quartermaine threatened to harm a witness's children. The prosecutor stated that he had not presented this information earlier because he had promised Trudy Klein, the witness to the threat, not to reveal the testimony "unless it became absolutely essential." According to the prosecutor, Klein feared for her safety if it became necessary for the government to release her name.

On September 1, 1989, Trudy Klein went to the Metropolitan Correctional Center ("MCC") to visit her ex-husband, Timothy Klein. While waiting for her ex-husband in the visiting room, she spoke with Quartermaine who was visiting with Julie Telleachea. Quartermaine told Klein that Gary Ballough was testifying against him. Klein, who is a friend of Gary's wife, Karen Ballough, told Quartermaine that she did not believe that Ballough would testify. Quartermaine stated that Ballough's testimony was keeping Quartermaine from seeing his children, and that if he could not see his children, he would hurt Ballough's children.

The government became aware of this threat because Quartermaine spoke loudly enough for other people in the visiting area to overhear it. The government tracked down Klein and prepared a subpoena for her attendance at the detention hearing. Rather than appear at the hearing, Klein chose to speak directly with the prosecutor in the presence of her attorneys. In light of this evidence concerning a recent threat against a witness, the magistrate again denied Quartermaine's motion for pretrial release.

### D. Fourth Detention Hearing

On November 20, 1989, the magistrate held the fourth and final detention hearing on Quartermaine's motion based on new evidence. At that hearing, two of Quartermaine's children, fifteen-year-old Stephanie and nineteen-year-old Lorrie, testified that Trudy Klein came to their home and apologized to them and to their mother for testi-

fying that Quartermaine had threatened a witness. According to them, Klein explained that she had only given that testimony in response to pressure and threats by the United States Attorney. Stephanie testified that Klein apologized, saying "they threatened to put me in jail for five years—Mr. Shockley did—and take away my kids from me so I had no other choice but to lie. I didn't want my husband to be transferred [to another jail]...." Stephanie also stated that Klein did not speak with Quartermaine at all. Quartermaine's counsel also proffered testimony from Timothy Klein that Trudy Klein had not heard a threat from Quartermaine, but that she was heavily pressured by the prosecution.

Quartermaine also argued that his release should be granted because the government was seeking the return of a third superseding indictment, potentially putting trial over until the spring of 1990.

The magistrate stated that he did not believe that the prosecutor had pressured or threatened Trudy Klein. But he found that "[w]hether the threat happened now, only the Shadow knows and God; I don't." Based on this new testimony, the likelihood of a superseding indictment, and the possible delay of the trial until the spring of 1990, the magistrate ordered Quartermaine's release on a $250,000 corporate surety bond. The magistrate found that the evidence of danger to the community was not clear and convincing. The magistrate also stated that it did not "appear to be fair" for Quartermaine to be detained pending a third superseding indictment.

## PROCEDURAL HISTORY

On December 21, 1989, the district court affirmed the magistrate's decision and set bail in accordance with the magistrate's November 20th order. On January 3, 1990, the government filed a motion to reconsider. On March 22, 1990, the district court found that pretrial detention was not warranted, resolving all pending bond issues. The government sought an emergency stay of that order, but the district court denied the motion for a stay.

## CONTENTIONS OF THE PARTIES

The government contends that the district court erred in failing to provide any written reasons or other factual findings for granting release on bail. The government also contends that Quartermaine did not overcome the statutory presumptions of danger to the community and risk of flight.

Quartermaine contends that the district court is not required to give written reasons or other specific findings of fact for an order *granting* release. Quartermaine also contends that he sufficiently rebutted the presumptions and the government's evidence concerning a risk of flight or danger to the community.

## ISSUE

The issue is: whether the government proved by a preponderance of the evidence that Quartermaine posed a risk of flight, and whether the government proved by clear and convincing evidence that Quartermaine posed a danger to the community.

## DISCUSSION

■ District court orders granting or denying detention under the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*, ("the Act") present mixed questions of law and fact subject to plenary review on appeal. *United States v. King*, 849 F.2d 485, 487 (11th Cir.1988). Purely factual findings, however, will not be disturbed unless they are clearly erroneous. *United States v. King*, 849 F.2d at 487. "A finding of fact is clearly erroneous only when a reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. Edmondson*, 791 F.2d 1512, 1514–15 (11th Cir.1986) (citation omitted).

■ The Act provides a rebuttable presumption of risk of flight or danger to the community when a defendant has been indicated for certain crimes.

Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably as-

sure the appearance of the person as required and the safety of the community if the judicial officer finds that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in ... section 1 of the Act of September 15, 1980 (21 U.S.C. § 955a)....

18 U.S.C. § 3142(e) (1985). A grand jury indictment provides the probable cause required by the statute to trigger the presumption. *United States v. Hurtado,* 779 F.2d 1467, 1479 (11th Cir.1985). Thus, Quartermaine's indictment by the grand jury for violation of 21 U.S.C. § 955a raises the rebuttable presumptions of risk of flight and danger to the community.

■■■■ Once the statutory presumptions are raised, the defendant carries the burden of production to come forward with evidence to rebut the presumptions. The defendant's obligation to come forward with evidence does not shift to the defendant the government's burden of persuasion. *United States v. King,* 849 F.2d at 488. Therefore, Quartermaine had the burden to produce evidence "to suggest that he ... [was] either not dangerous or not likely to flee if turned loose on bail." *Hurtado,* 779 F.2d at 1479. Even if this evidence is sufficient to rebut the statutory presumption, the presumption "remains in the case as an evidentiary finding militating against release, to be weigh[ed] along with other evidence relative to factors listed in section 3142(g)." *United States v. King,* 849 F.2d at 488 (quoting *United States v. Portes,* 786 F.2d 758, 764 (7th Cir.1985) (citation omitted)). The presumption becomes evidence to be considered along with other evidence listed in the Act as indicative of risk of flight or danger to the community. The Act provides the following guidelines:

> **(g) Factors to be considered.**—The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—

> (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence and involves a narcotic drug;

> (2) The weight of the evidence against the person;

> (3) The history and characteristics of the person, including

> A. his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history and record concerning appearance at court proceeding; and

> B. whether, at the time of the current offense or arrest he was on probation, or parol, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C.A. § 3142(g) (West Supp.1990). On the risk of flight, Quartermaine proffered the following evidence:

> (1) that he had lived continuously in the United States since he was two years old;

> (2) that he had appeared faithfully at all proceedings in this case; and

> (3) that members of his family, his girlfriend, and his girlfriend's family were willing to post substantially all of their property to assure his presence at trial.

■■■■ The government presented substantial evidence of Quartermaine's risk of flight. The government proffered that Quartermaine had access to considerable funds outside of the United States; that Quartermaine had relatives in Honduras, and that he had stated once that Honduras and not the United States was his country; that Quartermaine had additional family and business ties to Panama and Colombia; and that Quartermaine's failure to appear at proceedings in unrelated misdemeanor and domestic cases evidenced his risk of flight. Upon his arrest in a separate incident, Quartermaine asserted that Hondu-

ras was his home and stated that law enforcement officials would find him there in the future. In addition, Quartermaine initially denied that he had any assets, although he had access to funds from the alleged trust in the Cayman Islands.

We hold that the government established by a preponderance of the evidence that no condition or set of conditions will reasonably assure Quartermaine's presence at trial. *See United States v. King*, 849 F.2d at 489 (government's burden of proof in risk of flight is preponderance of the evidence). Quartermaine's ties to the community do not outweigh the presumption plus the evidence of his financial assets outside the country, his family tie to Honduras, and his statement to a law enforcement officer suggesting that he would flee, particularly in light of the potential maximum sentence of life plus sixty years that he faces under the indictment.

■ We also hold that the government presented clear and convincing evidence that Quartermaine constitutes a danger to certain individuals and to the community. *See United States v. King*, 849 F.2d at 489 n. 3 (government's burden of proof or dangerousness is clear and convincing evidence).

Quartermaine sought to rebut the statutory presumption and other evidence proffered by the government of his danger to the community with the following evidence:

(1) that he only struck his daughter in the parking lot as a matter of fatherly discipline;

(2) that he only struck his wife after she hit him first during messy divorce proceedings;

(3) that his reputation for violence and intimidation was based on 'stale' incidents and information;

(4) that the witness lied about an alleged recent threat by Quartermaine because she was pressured to do so by the prosecution;

(5) that no witnesses had received threats despite another family member's release on bail;

(6) that Stephanie, his daughter, testified that she had a wonderful relationship with her father; and

(7) that members of his family and his girlfriend attest that he is incapable of violence.

We hold that this evidence is insufficient to overcome the combination of the statutory presumptions and the additional evidence, showing: that at least a dozen witnesses feared for their safety if they testified publicly against Quartermaine; that Quartermaine had beaten his wife and his daughter on separate occasions, and in the presence of law enforcement officers; that Quartermaine had to be isolated during his pretrial detention because of fighting; that Quartermaine had threatened to harm a witness's children if he testified; and that Quartermaine is a drug addict.

■ Quartermaine argues that his history of drug addiction should not be added to the presumption of danger to the community arising from his indictment on drug charges. An individual's personal drug use is a separate issue from the individual's activities importing and distributing drugs which give rise to the presumption. The Act specifically provides, however, for consideration of the accused's "history relating to drug or alcohol abuse." 18 U.S.C.A. § 3142(g)(3)(A) (West 1985). In addition, we reject Quartermaine's suggestion that his acts of "domestic" violence do not support a finding of dangerousness to the community. A willingness to strike loved ones offers probative evidence of a tendency to violence and dangerousness toward others.

■ Despite all the evidence proffered concerning Quartermaine's dangerousness, the magistrate apparently felt compelled to release him because of the potential duration of detention if the government returned a third superseding indictment. The Act itself, however, does not provide that pretrial delay should be considered as a factor.

In *United States v. Gonzales–Claudio*, 806 F.2d 334, 339 (2d Cir., *cert. dismissed sub nom. Melendez–Carrion v. United States*, 479 U.S. 978, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986), the government did not dispute that "at some point and under some circumstances, the duration of pretrial detention becomes unconstitutional." In that case, the court held that the detention of

the defendants beyond fourteen months would exceed the standards of due process. *See also United States v. Zannino*, 798 F.2d 544, 548 (1st Cir.1986) (in perhaps most cases, sixteen months would be found to exceed due process limitations). *But see United States v. Berrios–Berrios*, 791 F.2d 246 (2d Cir.), *cert. dismissed*, 479 U.S. 978, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986) (eight months of pretrial detention was not unconstitutional solely because of its length); *United States v. Colombo*, 777 F.2d 96, 101 (2d Cir.1985) (after seven months pretrial detention, court declined to decide whether a substantial period of continued detention would violate Constitution); *United States v. Martinez*, 678 F.Supp. 267, 269 (S.D.Fla. 1988) (district court refused release after fourteen months of pretrial detention).

In November, 1989, when the magistrate first ordered his release, Quartermaine had been in pretrial detention for five months. At that time, the magistrate envisioned that Quartermaine would not go to trial before the spring of 1990. The district court erred when it released Quartermaine after eight months of pretrial detention based solely on pretrial delay. We hold that the prospect of eight to ten months of pretrial detention, without more, does not mandate the release of a defendant for whom pretrial detention is otherwise appropriate. *See United States v. Gonzales–Claudio*, 806 F.2d at 340 (factors include duration of detention, responsibility of government for the delay, and the strength of the evidence concerning risk of flight).

### CONCLUSION

The government has presented clear and convincing evidence that no condition or combination of conditions can reasonably assure Quartermaine's presence at trial or the safety of individuals and the community.

Accordingly, the district court is reversed and the case remanded for further proceedings.

REVERSED and REMANDED.