UNITED STATES of America,

v.

Liborio BELLOMO, Defendant.

No. 96 Cr. 430(LAK).

United States District Court,
S.D. New York.

Oct. 30, 1996.

Nelson Boxer, Assistant United States Attorney, Mary Jo White, United States Attorney, New York City, for U.S.

Benjamin Brafman, Brafman, Gilbert & Ross, P.C., New York City, for Defendant.

## AMENDED MEMORANDUM OPINION

KAPLAN, District Judge.

Defendant Liborio Bellomo is charged in six counts of a sixty-count indictment that accuses various alleged members and associates of the Genovese organized crime family with participating in a variety of criminal activities. The indictment charges that Bellomo was and is the acting boss of the Genovese family and one of the persons responsible for, among other things, resolving disputes among the five organized crime families in New York City.

Bellomo is charged in both racketeering counts of the indictment and is alleged to have participated in three predicate acts of racketeering—murder and/or murder conspiracy, extortion and labor racketeering. He is charged in substantive counts with murder and conspiracy to murder in aid of racketeering, as well as extortion. If convicted of the murder charge, Bellomo faces a mandatory term of life imprisonment. The extortion charge carries a maximum term of twenty years imprisonment.

Bellomo initially consented to the entry of a detention order, pursuant to 18 U.S.C. § 3142(e)–(f), by the Magistrate Judge subject to his right later to seek release pending trial. The matter now is before the Court on Bellomo's (a) application for review, pursuant to 18 U.S.C. § 3145(b), of the detention order, and (b) motion to dismiss the indictment, hold unspecified government officers in contempt and for a gag order, all on the basis that a photograph of Bellomo, obtained by the government six years ago pursuant to a grand jury subpoena, appeared in the press.

### Discussion

#### Bail

■ The government is entitled to detain Bellomo if it establishes "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community ..." 18 U.S.C. § 3142(e). The factors to be considered in making such a determination include the nature and circumstances of the offense, the weight of the evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. The burden of proof is a preponderance of the evidence, except that a finding adverse to the defendant on the safety to other persons and community branch of the standard must

rest on clear and convincing evidence. *Id.* § 3142(f); *United States v. Martir,* 782 F.2d 1141, 1146 (2d Cir.1986). The Court, moreover, has broad discretion with respect to the manner in which it obtains information bearing on the relevant factors. *Martir,* 782 F.2d at 1145. It may permit the government to proceed, as it has done here, by proffer rather than presenting live testimony. *See United States v. Ferranti,* 66 F.3d 540, 542 (2d Cir.1995); *Martir,* 782 F.2d at 1145. In considering Bellomo's application, the Court determines the matter *de novo. United States v. Leon,* 766 F.2d 77, 80 (2d Cir.1985).

The Court finds by clear and convincing evidence that Bellomo is a serious risk of flight, that his release would pose a substantial danger to the community, and that no condition or combination of conditions would assure his appearance or adequately protect the community in the event of his release.

### Nature and Seriousness of Offenses

Bellomo faces mandatory life imprisonment if convicted on the murder charge. He faces a maximum sentence of twenty years on each of the extortion charges.[1] Bellomo, who is 39 years old, has great incentive to flee prosecution due to the possibility that he will spend the remainder of his life in prison. The fact that Bellomo is accused of murder and extortion is a factor to be considered in determining whether he is a serious danger to the community.

### Weight of the Evidence

While defendant's counsel argues that the government's evidence is meager, the Court finds otherwise. According to the government's proffer, which the Court credits for these purposes, a cooperating witness will describe Bellomo's role in directing, approving and/or sanctioning the murder of Ralph DeSimone, who was killed because it was brought to the attention of Bellomo and others that his behavior suggested that he was an informant.

There is strong evidence as well of Bellomo's participation in the alleged extortion of a company known as Enviro Express and in labor racketeering. The government's proffer indicates that a cooperating witness will testify to the extortion and that the government will offer documents showing monthly "consulting" payments to a company said to have been controlled by Bellomo. The Court is advised also that testimony of cooperating witnesses and court-authorized interceptions of oral communications will show that Bellomo was involved in seeking to retain control of Local 46 of the Mason Tenders District Council of Greater New York, control that would enable the Genovese family to receive unlawful labor payments. The Court credits these representations.

■ Bellomo argues that the government's case on the murder charge is weak. He relies chiefly on reports of two polygraph examiners, who state in substance that they believe that Bellomo was truthful in denying, under polygraph examination, involvement in the DeSimone murder. The Court is unpersuaded.

■ The polygraph evidence is properly considered on this application, despite its long established inadmissibility in criminal trials,[2] because the rules of evidence do not apply in detention hearings under the Bail Reform Act. 18 U.S.C. § 3142(f). It is important, however, to be clear as to its relevance.

The issue now before the Court is whether there is a risk that Bellomo will flee the jurisdiction or endanger others before the trial can be held, not whether he is guilty or innocent of the charges in the indictment. The polygraph results therefore are relevant only to the extent they bear on whether Bellomo has an incentive to flee or poses a threat to the community.

---

1. The Sentencing Guidelines probably would call for a shorter sentence, absent an upward departure, if Bellomo were convicted on the extortion charges alone.

2. *See, e.g., United States v. Kwong,* 69 F.3d 663, 668 (2d Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1343, 134 L.Ed.2d 491 (1996); *United States v. Rea,* 958 F.2d 1206, 1224 (2d Cir.1992); *United States v. Lech,* 895 F.Supp. 582 (S.D.N.Y. 1995).

*Questionable Admissibility Makes Polygraph Evidence a Weak Counter to a Strong Government Case*

A major significance in a detention hearing of the strength of the government's case is its bearing on the extent to which the defendant has a motive to flee prosecution if released pending trial. All other things being equal, a defendant facing serious potential penalties in the event of conviction is more likely to disappear if the government's case is strong than if an acquittal appears likely.

As noted, the government in this case has strong evidence of Bellomo's guilt on the murder and murder conspiracy charges. It evidently has an eyewitness who will testify to Bellomo's involvement in ordering or approving the charged murder, evidence that is quite likely to be received in evidence at trial.

Bellomo's polygraph evidence, even if it were persuasive as measured by the standard of polygraph tests generally, would not diminish the strength of the government's case sufficiently to mitigate Bellomo's strong incentive to flee. For one thing, as Bellomo's counsel conceded at argument, polygraph evidence never has been admitted in a federal trial in this Circuit, even in the three years since *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). While the admissibility of polygraph evidence in light of *Daubert* perhaps is an open question, *but see Lech,* 895 F.Supp. at 585–86 (characterizing argument as "tenuous"), Bellomo confronts at least a significant possibility that the evidence will be excluded even if it is offered.[3] Moreover, even if admitted, the polygraph results would not be conclusive, and Bellomo still would face the risk that the jury would accept the government's evidence rather than that of Bellomo's polygraphers. The polygraph evidence in the best of circumstances therefore would be of questionable value. It does not overcome the government's proof that Bellomo has powerful reasons to disappear.

Although it fails as a rebuttal to the government's showing that Bellomo is a flight risk, polygraph evidence in theory might be relevant also to the determination of whether Bellomo is a danger to the community. The Court has considered the polygraph evidence, to the extent it believes is appropriate, in regard to this issue as well. However, it does not think the evidence is entitled to much weight.

*Weaknesses of the Tests Offered by Bellomo*

Bellomo offered results of two polygraph examinations, one conducted by Nat Laurendi and the other conducted by the Arthers. The Court declines to rely on the Laurendi results in view of the government's uncontested proffer that Laurendi failed to recognize obvious signs of deception and failed to follow normal and accepted polygraph procedures.

Nor is the Arther test free of problems. To begin with, the Arther test was administered by Catherine A. Arther, but analyzed and reported upon by Richard O. Arther. Such "blind" polygraph results have been found to be particularly prone to errors. *See* Department of Defense, *The Accuracy and Utility of Polygraph Testing* 59 (1984); Donald A. Dripps, *Police, Plus Perjury, Equals Polygraphy,* 86 J. Crim L. & Criminology 693, 704–05 (1996). Much more significant, however, is the difficulty raised by the nature of the questions asked in the Arther examination and their relationship to the government's theory of the case.

 The validity of polygraph evidence is highly dependent on the questions put to the subject by the examiner. Unless the wording of the questions is unequivocally dispositive of the guilt or innocence of the subject, the subject could be truthful in all responses and still be guilty of the crime in question. In examining polygraph evidence, therefore, courts must examine the questions posed with great care. *See Lech,* 895 F.Supp. at 584 (holding polygraph evidence inadmissible due in part to problems with questions posed). In particular, it is important that the questions focus on the specific

---

**3.** Bellomo well may conclude that the polygraph evidence, if received, may hurt him more than it helps. He certainly did not deny his role in the

Genovese family or his guilt of the other offenses charged while under examination.

factual circumstances at issue rather than calling for the subject's belief as to the legal implications of his actions, as the subject's misunderstanding of the legal implications may yield a false result even where the subject's actions warrant a different conclusion. *Id.*

The government's theory in this case is that Bellomo is guilty of murder or conspiracy to murder because he ordered or sanctioned the killing of DeSimone. The indictment, moreover, does not indicate the manner in which Bellomo is alleged to have done so.

The questions posed in the Arther examination were these:

(1) Did you know of any plan to murder Ralph DeSimone?

(2) Did you murder Ralph DeSimone?

(3) Did you see Ralph DeSimone get murdered?

(4) Five minutes before Ralph DeSimone's body was found at LaGuardia Airport, did you already know he was dead?

Questions 2, 3 and 4 are not even arguably responsive to the government's theory. There is no claim here that Bellomo killed DeSimone himself, saw the killing, or learned before the body was found that the killing had been carried out. Question 2, moreover, disregards the alleged act or acts (*e.g.,* ordering or sanctioning the killing) in favor of a conclusory statement concerning legal implications (*i.e.,* whether the subject's conduct constituted the crime of murder). If a subject incorrectly believed that one is guilty of murder only if one directly takes the life of another, the subject could "pass" a polygraph examination on that question even if one had ordered another person to carry out a killing. Further, Bellomo overlooks the fact that his answer to Question 4 was characterized by his own examiner as "irregular and erratic." (Def.Mem.Ex. 1)

Question 1 appears to present a closer issue, but only at first blush. An individual might order or sanction a killing by another while remaining ignorant of the details by which the killing was, or was to be, carried out. If such a person regarded a "plan" to kill another person as the details about the time, place and manner in which the killing was to be accomplished, he or she "truthfully" might deny knowledge of a plan to commit the murder despite the commission of acts warranting the legal conclusion that he or she is guilty of murder. Indeed, Henry II of England did public penance for the murder of St. Thomas à Becket by his minions, who acted without Henry's knowledge in response to his question, "Who will rid me of this meddlesome priest?"

In sum, Bellomo's answers to each of the questions on the Arther polygraph test all might have been "true" in the sense that Bellomo subjectively believed that they were factually accurate, and they still would not necessarily contradict any of the government's proffered evidence. For this reason, among others, the Court finds this polygraph examination of little value.[4]

*Defendant's Argument on Probable Accuracy of Tests is Incorrect*

Bellomo argues next that his polygraph evidence is especially probative of his innocence because two separate defendants, Bellomo and Generoso, "passed" polygraph tests in which they denied involvement with the murder. Starting with an assumption of a maximum error rate of 30 percent for polygraph tests, the defense argues that the error rate in this case is at most 15 percent because the likelihood of both defendants' deceiving the examiner is half the normal error rate. Defendant's argument is flawed, however, in that the guilt or innocence of each defendant is an entirely separate matter even though the government's theory links them in the commission of the murder. Either defendant could be unrelated to the

---

**4.** While the questions asked in the Laurendi polygraph examination were far broader, Bellomo's counsel made much of the accuracy of the Arther polygraph at oral argument, and put far less emphasis on the quality of the Laurendi results. This may have been due to the FBI's evaluation of the Laurendi exam as unreliable (with which the Court agrees) or for other reasons. The Court notes with interest, however, that counsel prepared two separate sets of questions for the two tests and had the Arther examiner pose questions which clearly were more limited in scope and did not go to the theory of the government's case against Bellomo.

crime, and the other still could be guilty. Each defendant was examined as to an independent event, his own involvement with the alleged murder. Both might not, therefore, be misleading the examiner if both denied involvement with the murder and both passed the test. In such a case, the possibility that Bellomo's test was flawed still would be up to 30 percent, as the answers given by each defendant are wholly independent of each other.

*History and Characteristics of the Defendant*

The defendant has submitted voluminous evidence to the effect that he is a good and caring father, a good neighbor, a person with ties to his community, and a patron of charitable causes. He points also to the fact that he has had only one minor criminal conviction in his past. There is no reason to doubt these assertions.

*Seriousness of Danger to any Person or the Community*

Bellomo argues that his release on bail would pose no danger to the community. He contends that there is "no evidence whatsoever that Mr. Bellomo engaged in any act of violence *after* 1991, nor is there *any* proof that he poses a danger *now*." (Def.Mem. at 51) (emphasis in original). The argument is without merit.

▬▬ To begin with, Bellomo stands accused of murder and other serious crimes. On the basis of the government's proffer, there is substantial reason to believe that he will be convicted. While the Bail Reform Act clearly does not require that one charged with such crimes be detained, or even that such persons should be detained if the evidence of the charged crime is strong. It would be foolish to suggest that the Court must ignore the crimes charged and the evidence of guilt in making its own independent, case-by-case assessment of danger. Nor is the dangerousness of a defendant determined solely by looking at the acts charged in the indictment. There is no requirement of a nexus between the charged conduct and the basis of a court's conclusion that a defendant is a serious danger to the community. *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir.1995); *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir.1991); *United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990); *United States v. Colombo*, 777 F.2d 96, 99–100 (2d Cir.1985). This Court therefore may look beyond the charged conduct to assess the degree of danger that the defendant poses.

The government here asserts—and Bellomo has not denied—that Bellomo is the acting boss of the Genovese crime family. This is extremely significant. As the Court of Appeals said in *United States v. Colombo*, 777 F.2d at 98, the leader of a criminal enterprise with the ability to order members of that enterprise to engage in criminal actions may be a danger to the community despite the lack of evidence that he directly participated in many, if any, of the charged crimes. *Accord, United States v. Orena*, 986 F.2d 628, 632 (2d Cir.1993).

The evidence at hand persuades this Court by clear and convincing evidence that Bellomo's release would pose a substantial danger to the community. This finding, moreover, is confirmed by—although it stands independently of—Bellomo's actions in relation to the polygraph examinations.

Polygraph examinations involve measurement of such physical signs as heart rate, blood volume and, in some subjects, galvanic skin responses while subjects respond to questions. The government has proffered evidence that Bellomo instructed Michael Resnick, another inmate in the institution in which Bellomo is incarcerated pending trial, to put aside Resnick's prescribed tablets of lithium so that Bellomo could ingest the tablets in an effort to "beat" the polygraph tests by reducing his reaction to the examiners' questions. Prison records corroborate this information to the extent that they show that Resnick was on a course of approximately 300 mg of lithium daily before Bellomo's first polygraph examination, that he asked before Bellomo's first examination to see the psychiatrist for the purpose of increasing his dosage, and that his dosage thereafter was doubled. Moreover, another entry in the prison medical records shows that Resnick was caught trying to carry medication away from the area in which it was dispensed just one

week before Bellomo's first examination. It thus appears that Bellomo sought to improve his prospects on the polygraph examinations by ingesting a drug which he thought would assist in producing the desired results.

Bellomo counters that all of this is a fantasy. He argues that lithium would not assist one in "beating" a polygraph examination because it would affect the subject's responses to both control and other questions equally and then only if substantial quantities were taken over a significant time period. He notes that the government's proffer, even if credited, dates the earliest effort to obtain lithium too close to the first polygraph examination for the lithium to have had any effect. Moreover, he points to the fact that the government's test of samples of his hair failed to confirm ingestion of lithium and was inconsistent with the ingestion of substantial quantities over an extended period.

Bellomo's arguments are beside the point. The Court assumes that lithium would affect polygraph examinations, if at all, only if taken in substantial quantities over an extended period and that Bellomo did not do so. The government's proffer indicates, however, that Bellomo thought that lithium would help him "beat" the examinations and sought a supply for that purpose. And that is what is important. For the Court finds that Bellomo tried to procure and probably took lithium, albeit took it in insufficient quantities to show up in the government's test, in a devious effort to deceive both the examiners and the Court. This attempt, misguided and unsuccessful as it may have been, is evidence of consciousness of guilt and willingness to engage in chicanery to subvert the due course of justice. It therefore is highly probative of defendant's danger to the community.

*Adequacy of Release Conditions*

■ The defendant has proposed a bail package consisting of a $2 million, fully secured bond, a personal recognizance bond, and extensive restrictions on his person including electronic monitoring and house arrest.[5] (Def.Mem. 53–54) This package, however, is manifestly insufficient.

■ As in *Colombo* and *Orena,* the nature and extent of the danger that Bellomo presents arises not only from the threat of violent acts on his part, but from his position of leadership in a criminal organization and his ability to plan, order, and supervise criminal activity arising from that position as well. He is a danger at least as much for what he might direct or assist others in doing as for what he might do himself. Keeping him under house arrest would not defuse this danger. Outside of jail, Bellomo might find a number of ways to get orders to his associates. The proposed supervision would be inadequate, and the proposed electronic surveillance could be circumvented. *United States v. Gotti,* 776 F.Supp. 666, 672–73 (E.D.N.Y.1991). The government is not obligated to replicate a jail in Bellomo's home so that he can be released. *Orena,* 986 F.2d 628 at 632; *Gotti,* 776 F.Supp. at 672. Incarceration therefore is the only viable method to ensure that Bellomo is unable to carry out criminal activity that will endanger persons in the community. *See Colombo,* 777 F.2d at 99; *Orena,* 986 F.2d at 632; *Ferranti,* 66 F.3d at 544 (all holding that leaders of criminal groups could not be released because the danger that they presented due to their ability to direct others to engage in criminal activities could not be controlled by bail conditions). Similar considerations warrant this Court's conclusion that such means could not ensure Bellomo's appearance at trial.

In consequence, the Court finds, by clear and convincing evidence, that neither the proposed package, nor any other conditions adequately would secure the appearance of the defendant and the safety of the community.

*The Grand Jury Secrecy Issues*

■ Bellomo claimed also that the indictment should be dismissed, government officials held in contempt, and a gag order imposed in consequence of an alleged breach by the government of grand jury secrecy.

In or about March 1990, Bellomo was subpoenaed to appear at the offices of the FBI

---

**5.** The package is quite similar to that found insufficient in *United States v. Orena,* 986 F.2d 628, 630 (2d Cir.1993), in which the defendant was found dangerous, much like Bellomo, because he could order killings by members of his crime family while on release.

and to allow himself to be photographed in connection with a grand jury investigation then pending. He did so. Copies of the photograph appeared in the *New York Daily News* on December 12, 1993 and in August 1996.

The government acknowledges that the photograph was grand jury material the confidentiality of which is protected by FED. R.CRIM.P. 6(e), but contends that its disclosure was inadvertent. It has presented a declaration by an Assistant United States Attorney in the Civil Division of the Southern District of New York stating that the photograph was appended to a witness' affidavit filed in a civil case in February 1993 to confirm the identity of a person identified by the witness only as "Barney." The photo and the declaration to which it was attached were filed with the court and served on Bellomo's counsel in the civil action. The photograph again was attached to a declaration by the same witness in 1994 in another civil action.

The photograph does not indicate on its face that it was obtained pursuant to a grand jury subpoena, and the AUSA has affirmed that she did not know until recently that the photograph was obtained pursuant to such a subpoena. She states that the disclosure of the photo was completely inadvertent. Bellomo's counsel accepted the government's explanation of the photo's release at oral argument.

Dismissal of the indictment for prosecutorial misconduct is an exceedingly rare sanction. It is granted only where "it is impossible to restore a criminal defendant to the position that he would have occupied vis-a-vis the prosecutor" or "when the pattern of misconduct is widespread or continuous." *United States v. Fields,* 592 F.2d 638, 648 (2d Cir.1978). In the Rule 6(e) context, the movant first must establish a *prima facie* case of a violation of Rule 6(e). *United States v. Rioux,* 97 F.3d 648 (2d Cir.1996). In determining whether a *prima facie* case is presented, a court should examine, inter alia, "(1) whether the media reports disclose matters occurring before the grand jury; (2) whether the media report discloses the source as one prohibited under Rule 6(e);

and (3) evidence presented by the Government to rebut allegations of a violation of Rule 6(e)." *Id.* Even if a *prima facie* case is established, dismissal should be granted only if a violation substantially influenced the decision to indict or if there is grave doubt regarding the absence of such substantial influence. *Id.* (citing *Bank of Nova Scotia v. United States,* 487 U.S. 250, 256, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988)).

Here there is no evidence that the release of the photo in question influenced the grand jury's decision to indict. Indeed, the first public appearance of the photograph occurred three years before, and the second after, the indictment was returned. Accordingly, there is no basis for dismissing the indictment on the basis of the inadvertent Rule 6(e) violation.

Defendant's motion calls also for the Court to hold the government in contempt for their violation of Rule 6(e), which provides that a knowing violation may be punished by contempt. The Court does not find the government to be in contempt in view of the sworn explanation, which all parties accept, that the releases of the photo were accidental. While the government should not be lauded for such mistakes, they are not a basis for holding the government in contempt.

The Court sees no need to impose a gag order at this stage. It assumes that all parties and counsel will comply with S.D.N.Y.CRIM.R. 7 and that counsel will discharge their obligations under the Code of Professional Responsibility.

### Conclusion

For the foregoing reasons, Bellomo's motion to dismiss the indictment and for other relief is denied in all respects. Bellomo is committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. He shall be afforded reasonable opportunity for private consultation with counsel. The person in charge of the corrections facility in which Bellomo is confined shall deliver him

to a United States marshal for the purpose of appearances in connection with court proceedings.

SO ORDERED.