[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 27, 2006
THOMAS K. KAHN
CLERK

No. 05-16662
Non-Argument Calendar

_____

D. C. Docket No. 05-00479-CR-1-JTC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HARRISON NORRIS, JR.,
a.k.a. Hardbody Harrison,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(June 27, 2006)**

Before BIRCH, CARNES  and PRYOR, Circuit Judges.

PER CURIAM:

Defendant-appellant, Harrison Norris, Jr., who is awaiting trial on charges of

falsely imprisoning young women, prostituting the alleged victims, and physically

and sexually assaulting them, appeals an order of the district court granting the

government's motion to revoke his release and impose pre-trial detention. Because

the government showed by clear and convincing evidence that Norris was a danger

to the community, we AFFIRM.

## I. BACKGROUND

A grand jury indicted Norris, along with two codefendants, Cedric Jackson

and Aimee Allen, on nine counts. Count One charged Norris with conspiracy to

hold young women to a condition of peonage, in violation of 18 U.S.C. § 1581(a),

to obtain forced labor and services of young women, in violation of 18 U.S.C.

§§ 1589(1) and (2), to traffic young women for purposes of peonage and forced

labor, in violation of 18 U.S.C. § 1590, and to traffic young women for commercial

sex acts, in violation of 18 U.S.C. § 1591(a), all in violation of 18 U.S.C. § 371.

Counts Two and Three charged Norris with holding K.R.[1] and N.H. to a condition

of peonage, including aggravated sexual abuse and attempted sexual abuse, in

violation of 18 U.S.C. §§ 1581(a) and 2. Counts Four and Five charged Norris

with obtaining labor and services from the same two victims "by means of threats

of serious harm to and physical restraints against" them, and by means of a plan to

_____

[1]The alleged victims are referred to by their initials to protect their privacy.

cause them to believe that if they did not perform the labor and service they and other persons "would suffer serious harm," in violation of 18 U.S.C. §§ 1589(1) and 2. R1-1 at 14. The indictment recited that this offense involved aggravated sexual abuse and attempted aggravated sexual abuse. Counts Six and Seven charged Norris with recruiting, harboring, transporting, providing, and obtaining by any means, the same two victims, for labor and services, in violation of 18 U.S.C. § 1590. According to the indictment, this offense also involved aggravated sexual abuse and attempted aggravated sexual abuse. Counts Eight and Nine charged Norris with recruiting, harboring, transporting, providing, and obtaining by any means the same two victims to participate in a venture which engaged in commercial sex acts, and benefitting financially from participating in that venture, in violation of 18 U.S.C. §§ 1591 and 2.

The government submitted an initial motion for pre-trial detention and submitted a brief reporting that the charges had arisen out of a chance encounter between a law enforcement agent and one of Norris's alleged victims in August 2004. Two of the defendants and seven of the victims had been at a local store. Some of the women approached the police officer and "pleaded with the police to arrest them so that they could escape Norris's abuse." R1-14 at 2. Norris was arrested and later released on bond.

3

The government further summarized that, a year later, law enforcement agents learned that two women had fled from Norris's home. Upon investigation at his home, they found a third woman who claimed to be falsely imprisoned. These three women provided statements of false imprisonment and prostitution by Norris similar to those given by the first three women. The women explained that Norris, a former professional wrestler, had "lured them to his house by claiming that he would train them to be professional wrestlers." Id. at 3. A federal investigation revealed additional victims whose interviews collectively indicated that Norris and his codefendants "systematically preyed upon poor, vulnerable women . . . [some] suffer[ing] from drug addiction or homelessness . . . by paying [their] legal fines or bail, or by using false pretenses." Id. at 3-4. Norris reportedly then introduced the women to prostitution. If a victim refused to cooperate, Norris would physically abuse and violently rape her, threaten her with abuse, and force her to witness the abuse of other women. Norris maintained control over the victims with the assistance of "seasoned prostitutes," who worked for him voluntarily, monitoring the women both inside and outside of the house, and imposing fines and various charges to keep them indebted to him. R1-14 at 4.

In its motion, the government argued that Norris should be detained before trial because "no condition[]or combination of condition[s] . . . [would] reasonably

assure the safety of the community if he [were] released." R1-14 at 6. The government asserted that the August 2004 charges of false imprisonment which were outstanding at the time he lured two further women into his wrestling training program in August 2005, created a rebuttable presumption that he should be detained. Additionally, the government contended that the factors listed in 18 U.S.C. § 3142 weighed in favor of detaining Norris – specifically, (1) the charges against Norris included eight crimes of violence, each with a maximum sentence of life imprisonment, (2) the evidence against him was powerful, and (3) Norris's lack of legitimate employment, filing for bankruptcy, and failure to file federal income tax returns all weighed in favor of detention. Finally, the government contended that Norris posed a significant danger to the community because he physically abused the victims, actively kept the victims imprisoned, continued to prostitute the victims, and searched for new women to become victims for his operation even after his August 2004 arrest.

On 20 October 2005, a magistrate judge conducted a detention hearing for Norris. During that hearing, the government proceeded by proffer and on the basis of the indictment. The government conceded that it had not met all three conditions for the rebuttable presumption pursuant to 18 U.S.C. § 3142, and thus

still had the burden to establish that Norris was a danger to the community.[2] R3 at 20. The government proffered that, during the investigation in connection with the 2005 reports, the police conducted a search of Norris's home and found ledger books listing various charges that indebted the women to Norris. Id. at 22. The police also found a list of rules, a sign-in sheet for the bathroom, and a woman's diary, which indicated that Norris beat her. Id. The government also pointed out that Norris had charges pending against him based upon both the 2004 and 2005 incidents.

Norris' counsel responded that Norris had never been convicted of any crime. Id. at 28. He explained that Norris was 39 years old, had graduated high school, had served in the army for over ten years, had made an unsuccessful attempt to join the NFL, and had wrestled professionally from 1995 through 2001 under the name "Hardbody Harrison." Id. at 28-29. He asserted that Norris had earned $50,000 a year while wrestling, but after suing his wrestling association, he had received a large settlement and no longer needed to work. Id. at 29-30. He explained that, because Norris was living off the large settlement, he did not file income tax returns as long as he was living off the settlement. Id. at 31. After he

---

[2]The government so conceded because § 3142(e)(1) requires a conviction (within the five previous years) for a crime of violence or offense for which the maximum sentence is life imprisonment or death, and, at the time of his 2005 arrest, Norris had only been charged with the 2004 offenses.

settled his lawsuit, he started his own wrestling company, "Star South Championship Wrestling Alliance." Id. He bought two houses, one for his wife and two children, and the other as a boarding house for wrestlers whom he trained. Id. at 31-32. He also built a ring and training center. Id. at 31. Norris allegedly primarily trained women wrestlers because it was a "niche" market with the potential to make "a lot more money." Id. at 32. He focused on women who were drug addicts, homeless, convicted felons, and generally "down on their luck" because they "had no future" and "had a desire to achieve." Id. at 32-33. As part of the training program, he ran a strict "boot camp" with a point system, sign-in sheets, and a violent atmosphere where people could get hurt just as when they wrestled in the ring. Id. at 33.

Norris' counsel also presented the testimony of five witnesses: (1) his wife, Audrey Norris, (2) two of the "team leaders" responsible for supervising the wrestling trainees, Leslie Smith and Michelle Achuff, (3) Norris's wrestling buddy, Robert Terry, and (4) the President of Norris's wrestling business, Dori Brevard. These witnesses each testified that they had no knowledge of any prostitution activities and asserted that anyone who lived with Norris was free to leave at any time, id. at 39-40, 67-68, 72, 103-04, 126, 153, although both Smith and Audrey Norris admitted knowing that one resident had left by cutting a hole in the screen

7

of the bathroom window while she was supposed to be taking a shower, id. at 61, 175-76, and Terry admitted that he had heard from "a person or two" in the wrestling business that Norris prostituted the women who lived with him, id. at 140. Most of them also conceded that neither they nor Norris made any money from the wrestling venture. Id. at 46-49, 75-76, 115, 117-18, 153. Smith and Achuff both admitted that they had gone, with Norris and other girls in his program, to "Mexican clubs" where they danced with men for five dollars a piece. Id. at 50-52, 91. Audrey Norris admitted knowing about this. Id. at 153-54. Smith and Achuff also each admitted having made inaccurate statements to federal investigators after the August 2005 raid, in which they claimed to have made more at wrestling and paid more in rent than they actually did, and whereby they denied having gone dancing for money. Id. at 51-52, 78-79. After the four-hour hearing, the magistrate judge determined that Norris should be released pending trial because, as a result of the government's having proceeded by proffer, the magistrate judge had not been given the opportunity to evaluate the credibility of the government's witnesses, such that the government had, in the magistrate judge's view, failed to meet its burden for Norris's detention. Id. at 190-92. The magistrate judge released Norris on bond, imposing conditions of release which included a "no-contact" provision for the alleged victims in the case. R1-41 at 2.

In its motion for stay and revocation of release, filed shortly after that hearing, the government repeated its arguments, insisting that it had shown by clear and convincing evidence that Norris was a danger to the community and that it had also shown he was a flight risk. R1-36 at 1. On 16 November 2005, the district court held a second detention hearing. By way of proffer, the government clarified that Norris had been arrested in 2001 on charges of pimping and had been arrested again in 2004 for three counts of false imprisonment. R4 at 8. The government also called three witnesses, Agent Mark Barear, Captain Keith Zganz, and Sergeant Robert Harvey.

Agent Barear testified that on 2 August 2005, he had spoken with two women who claimed to have been held against their will by Norris. Id. at 26-27. He reported that one of them, S.T., claimed that she had escaped from Norris's house by pretending to take a shower and then cutting her way through the window screen. Id. at 28. Agent Barear testified that he verified a few weeks later that the screen in the bathroom window at Norris's house had been cut. Id. S.T. told him that she met Norris at a store and he offered to train her to wrestle and to allow her to live at his place. Id. She had told him that she had received training in wrestling, but had earned money only through prostitution. Id. at 28-29. She claimed that she had lived with Norris eight weeks, and although she informed him

9

that she wanted to leave, he would not let her go because she owed him money. Id. at 30. She could only repay the money by performing certain daily services for Norris. Id. She stated that there were team leaders who supervised her and that they were there voluntarily and "loved [Norris]." Id. at 31. She explained to Agent Barear that she owed Norris $250 a month for the rent of half a room, $20 a week for groceries, and money to do her nails. Id. S.T. reported that Norris kept the money she earned from prostitution. Id. at 32. Although he said that S.T. had admitted to having sex with Norris, Agent Barear could not recall whether she stated that it was forced, coerced, or something else. Id.

The agent further testified that S.T. claimed that Norris physically abused her during a trip to Detroit . Id. at 33. When she stated that she wanted to leave, Norris told her to perform oral sex on another woman, threw condoms in her face, poked her in her chest, and threatened to knock her through a wall. Id. She explained to Agent Barear that she had a rank, and that when she went up in rank, there would be a pinning ceremony. Id. at 34. The ceremony involved Norris bracing a victim's back and then pushing the pin, without backing, through her shirt and into her skin. Id. She told Agent Barear that Norris kept her identification. Id. at 35. She informed Agent Barear that two other women who lived with Norris had been "sold off to another pimp." Id. Agent Barear testified

10

that she told him she felt that she could not leave him because he would beat her or sell her to another pimp. Id. at 36. The agent further testified to having heard a nearly identical report from another alleged victim, D.M. Id. at 36-41.

Captain Zganz testified that, in 2004, while he was investigating a consumer dispute at a local store, a woman had run out of the store and told him that she was being held against her will. Id. at 49-50. He testified that, after entering the store, he had seen Norris with seven women. Id. at 50. When they were all together, he reported, the women gave rehearsed, identical statements that they were there voluntarily. Id. at 51-52. When police officers separated the women and interviewed them individually, the stories changed. Id. at 52-54. Two of them, both visibly upset, complained of being held against their will and asked to be arrested in order to escape. Id. at 54-55. Captain Zganz reported that the police took the two women to the station for further interviews. Id. at 55. He further testified that Norris consented to a search of his car, where the police found ledgers that recorded money owed and paid and a suitcase full of sex toys and condoms. Id. at 57.

Sergeant Harvey testified that he had taken out a warrant for three counts of false imprisonment against Norris through the Cobb County magistrate office. Id. at 64. Sergeant Harvey also described his interview with T.W., one of the

11

alleged victims who had been arrested for prostitution. She told him how Norris had bonded her out and told her that she had to live with him and work for him. Id. at 67. She told Harvey that she had worked as a prostitute for Norris by going to different Mexican dance clubs, charging for dances, and then prostituting for sexual acts. Id. at 67-68. She told him that she had been controlled at all times by a "team leader." Id. at 68-69. Sergeant Harvey reported that T.W. told him that each woman who joined Norris's group would be forced to participate in a "cut party," which involved the new recruit performing various sexual acts on different men and women. Id. at 70-71. If the woman did not perform all the acts, the other women would force sexual acts on her with sex toys. Id. at 71. T.W. told Sergeant Harvey that, at one "cut party," Norris had head-butted a woman who refused to perform and had threatened to throw her out a window, and that she had later escaped by running to a friend's car she had spotted while leaving Wal-Mart with a team leader. Id. at 71-72. Sergeant Harvey testified that he had interviewed the alleged victim and she had corroborated that story. Id. at 72. Sergeant Harvey also reported that T.W. had told him that the night before the police took her away in August 2004, Norris had asked her to have sex with him and had threatened to kill her if she refused. Id. at 73-74.

At the end of the hearing, the court granted the government's motion and revoked Norris's release orders and ordered him detained pending trial. R4 at 156-58. The court first found the statements by the government's witnesses credible and consistent. Id. at 156. It pointed out that the crimes charged carry terms of life imprisonment, and thus that the seriousness of the crimes is "quite obvious." Id. at 157. The court summarized that having "considered the nature of the crime, the weight of the evidence in support of it, the history and characteristics of [Norris], and the nature of the danger to the individuals in the community" there was a "significant likelihood that [certain witnesses] might be intimidated or abused again with regard to their possible testimony in the case." Id.

In a written order, the court further explained that the indictment alleged crimes that were committed by force or by threat of force, and therefore, they were "crimes of violence" as defined under 18 U.S.C. § 3156(a)(4). R1-63 at 5. The court also found that the evidence against Norris was "strong" and that the indictment was "entitled to deference." Id. at 6. The court found that the government's witnesses were credible and that Norris's witnesses were generally not credible in that their testimony contradicted itself and that of other defense witnesses. The court further observed that each defense witness had a personal relationship with Norris, "and [was] therefore interested to some extent." Id. The

13

court noted that Norris's history and characteristics showed that he had a propensity to engage in the sort of activity with which he had been charged even while out on bail in connection with that conduct, that he had no verifiable source of income, which provided a motive for him to continue in the offensive conduct, and that, based on the testimony, Norris posed a danger to possible witnesses and to the public at large. Id. at 6-7. The court concluded that the government had shown by clear and convincing evidence that "no condition or combination of conditions [would] reasonably assure the safety of any other person or the community," should Norris be released. Id. at 5.

On appeal, Norris argues that the district court erred because the government did not satisfy its burden under 18 U.S.C. § 3142 of showing that pre-trial detention was appropriate. More specifically he contends both that he presented evidence that established he was not the type of person who would commit the alleged offenses, and that only half of the testimony favored detention while the other half supported release, and accordingly, that the government had failed to show by clear and convincing evidence that he should be detained.

## II. DISCUSSION

Cases arising under 18 U.S.C. § 3142, as mixed questions of law and fact, are subject to plenary review. United States v. Quartermaine, 913 F.2d 910, 915

14

(11th Cir. 1990). However, a district court's factual findings in connection with the §3142 determination are reviewed only for clear error. Id. "A finding of fact is clearly erroneous only when a reviewing court is left with the definite and firm conviction that a mistake has been committed." Id. (quotations omitted).

Under 18 U.S.C. § 3142(e), if a district court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," then the person should be ordered detained before trial. We have observed that it was Congress's intent that the "safety of any other person" include the defendant's level of dangerousness to any identifiable individual, notably a victim or witness. United States v. King, 849 F.2d 485, 487 n.2 (11th Cir. 1988). The government must show the necessary potential danger by clear and convincing evidence. 18 U.S.C. § 3142(f)(2); see Quartermaine, 913 F.2d at 915. Further, "the rules concerning admissibility of evidence in criminal trials do not apply" in the presentation of evidence for purposes of this determination. 18 U.S.C. § 3142(f)(2).

The following factors should be considered in determining whether a person poses danger to the community:

> (1)    The nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . ;
> (2)    the weight of the evidence against the person;
> (3)    the history and characteristics of the person, including–

     (A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

     (B)    whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

  (4)    the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). Consideration of factors under § 3142(g)(1) and (2) require plenary review, but those under § 3142(g)(3) and (4) pose purely factual questions subject only to review for clear error. United States v. Hurtado, 779 F.2d 1467, 1472 (11th Cir. 1985).

In this case, an analysis of these four factors supports the district court's finding that Norris poses a danger to the community. The first factor–nature of the offense charged–clearly weighs in favor of detention. Norris does not dispute the district court's finding that he has been charged with crimes of violence. Further, the seriousness of the crimes charged, all but one of which carry a maximum sentence of life imprisonment, weighs in favor of detention. See 18 U.S.C. §§ 1581(a), 1589, 1590, 1591(b). Accordingly, under plenary review, we find no

16

error in the district court's finding that Norris's crimes constituted violent crimes, thus weighing in favor of detention.

The second factor–weight of the evidence–also weighs in favor of detention. We have held that a grand jury indictment conclusively establishes probable cause to implicate a person in a crime. Hurtado, 779 F.2d at 1477. Furthermore, the government presented three police officers who separately interviewed eight different victims who presented very similar accounts of the crimes with which Norris has been charged. The officers also testified to the existence of physical evidence corroborating the accounts of these witnesses.

In contrast, the evidence presented by Norris was not persuasive in opposition to detention. The first two witnesses, team leaders who lived with Norris, appeared biased, admitted to having lied to investigating agents, and in some cases offered testimony that was inconsistent with that of other witnesses. Additionally, upon cross-examination, these same witnesses actually confirmed information presented by the police officers. Similarly, two of Norris's other witnesses confirmed that Norris did not have income and that he organized events at strip clubs. Norris's wife also confirmed the evidence presented by the officers.[3]

---

[3]Although Norris argues to the contrary, a court may consider hearsay evidence for purposes of a determination pursuant to 18 U.S.C. § 3142. See 18 U.S.C. § 3142(f)(2). Further, there is no requirement that the government present physical evidence. See 18 U.S.C. § 3142.

17

Accordingly, under plenary review, we conclude that the district court did not err in finding that the government presented strong evidence that Norris engaged in the alleged offenses.

The third factor–Norris's history and characteristics–provided the weakest case, but still serves to support detention. Norris did successfully serve in the military, has no prior convictions or any history of drug or alcohol abuse. He has also attended all his court proceedings. Nevertheless, he does have two prior charges against him involving similar conduct. He also has no legitimate employment or income and he no longer has any savings. We find no clear error in the district court's assessment of this factor as weighing in favor of detention.

The fourth factor–nature and seriousness of the danger the person poses to another person or the community–weighs, once again, clearly in favor of detention. As the previous summary of the evidence indicated, Norris is charged with crimes that involve violence, and the victims have alleged that Norris physically abused them and threatened abuse. The victims have also alleged that Norris preyed upon women by offering to train them for wrestling and then enslaving them into prostitution. Accordingly, there is evidence in the record to support the district court's conclusion that Norris poses a serious danger both to potential witnesses

18

and to the community at large, because of the possibility that he will trap other women.  Thus, there is no clear error.

In sum, the record–including the fact that eight of the charges against him carry a maximum sentence of life imprisonment and that they are all crimes of violence, the strong evidence against Norris, Norris's lack of legitimate employment or income, and the seriousness of the danger he poses to the victim-witnesses and to the community generally–overwhelmingly weighs in favor of detention.  Thus, upon plenary review, we find that the district court did not err in finding that the government met its burden in establishing that Norris should be detained because he is a danger to the community.[4]

### III. CONCLUSION

Norris appeals a district court order revoking his release and imposing detention pending his trial on charges of false imprisonment, forcing prostitution,, and physical and sexual assault.  Because the government showed by clear and convincing evidence that Norris was a danger to the community, we conclude that the district court did not err in revoking his release and ordering him detained until his trial.  Accordingly, we **AFFIRM.**

---

[4]Because we conclude the government sufficiently showed that Norris posed a danger to the community, it is not necessary to address the government's alternative argument that Norris should be detained because he is a flight risk.